ROB BONTA
Attorney General of California
DAVID A. ZONANA
Supervising Deputy Attorney General
GEORGE TORGUN, State Bar No. 222085
Deputy Attorney General
  1515 Clay Street, 20th Floor
  P.O. Box 70550
  Oakland, CA  94612-0550
  Telephone:  (510) 879-1002
  Fax:  (510) 622-2270
  E-mail:  George.Torgun@doj.ca.gov

*Attorneys for Plaintiff State of California*

*[Additional counsel listed on signature page]*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, STATE OF NEW YORK, COMMONWEALTH OF PENNSYLVANIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MARYLAND, PEOPLE OF THE STATE OF MICHIGAN, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH CAROLINA, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF WASHINGTON, DISTRICT OF COLUMBIA, CITY OF NEW YORK, and the BAY AREA AIR QUALITY MANAGEMENT DISTRICT,** | Case No. 3:22-cv-02583-JD<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | |
| **v.** | |
| **UNITED STATES POSTAL SERVICE, and LOUIS DEJOY, in his official capacity as United States Postmaster General,** | |
| Defendants. | |

## INTRODUCTION

1.     The United States Postal Service has one of the largest civilian vehicle fleets in the world.  Its vehicles are on the road, six days a week, in every community in the United States.

1

While they play a critical role delivering the nation's mail, these vehicles also pollute the air in the communities where they operate and emit significant amounts of greenhouse gases.  As its current vehicle fleet nears the end of its useful life, the Postal Service has been presented with a tremendous opportunity to convert its fleet to zero-emission, electric vehicles, a change that would alleviate pollution in overburdened communities and help tackle the climate crisis.

2.      Given the transformational nature of this change and its significant environmental and public health implications, the Postal Service was obligated to follow a process mandated by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq*., to take a "hard look" at the impacts of its "Next Generation Delivery Vehicle Acquisitions" program – to look before it leaps.  The Postal Service failed to do so here.  Instead, the Postal Service first chose a manufacturer with minimal experience in producing electric vehicles, signed a contract, and made a substantial down payment for new vehicles.  Only then did the Postal Service publish a cursory environmental review to justify the decision to replace 90 percent of its delivery fleet with fossil-fuel-powered, internal combustion engine vehicles, despite other available, environmentally preferable alternatives.  In doing so, the Postal Service failed to comply with even the most basic requirements of NEPA.

3.      In particular, the Postal Service violated well-established legal precedent prohibiting "an irreversible and irretrievable commitment of resources" before completing the NEPA process by signing contracts with a defense company (Oshkosh Defense, LLC) to procure vehicles six months before even releasing its draft environmental review, and a year prior to issuing the Final Environmental Impact Statement ("Final EIS") and Record of Decision.

4.      The Postal Service also failed to consider and evaluate reasonable alternatives to its action.  During its environmental review, the Postal Service put forward a proposed action that would largely continue the status quo by replacing 90 percent of its fleet with fossil-fuel powered, internal combustion engine vehicles.  The Postal Service then evaluated only 10 percent electric and 100 percent electric vehicle options, while arbitrarily rejecting any consideration of fleets with a larger mix of electric vehicles.

First Amended Complaint for Declaratory and Injunctive Relief – Case No. 3:22-cv-02583-JD

5.    The Postal Service further failed to take the required "hard look" at these alternatives. Specifically, the Postal Service did not properly evaluate several environmental impacts of its action, including air quality, environmental justice, and climate harms, by simply assuming that any upgrade to its vehicle fleet would have positive impacts on the environment.

6.    The Postal Service also failed to ensure the scientific integrity of its analysis by relying on unfounded assumptions regarding the costs and performance of electric vehicles, infrastructure, and gas prices, and refusing to identify the source of the data relied upon in the Final EIS.

7.    Finally, the Postal Service failed to consider inconsistencies of its Preferred Alternative with Plaintiffs' laws and policies to reduce fossil fuel consumption and to electrify the transportation sector.

8.    Accordingly, Plaintiffs State of California, State of New York, Commonwealth of Pennsylvania, State of Colorado, State of Connecticut, State of Delaware, State of Illinois, State of Maine, State of Maryland, People of the State of Michigan, State of New Jersey, State of New Mexico, State of North Carolina, State of Oregon, State of Rhode Island, State of Vermont, State of Washington, District of Columbia, the City of New York, and the Bay Area Air Quality Management District (collectively, "Plaintiffs") seek a declaration that the Postal Service's Final EIS and Record of Decision for its Next Generation Delivery Vehicle Acquisitions program violated NEPA, request that the Court vacate and set aside the Final EIS and Record of Decision, and enjoin actions by the Postal Service under its Next Generation Delivery Vehicle Acquisitions program until it has complied with NEPA.

**JURISDICTION AND VENUE**

9.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1346 (civil action against the United States), 39 U.S.C. § 401 (authorizing suits against the Postal Service), and 39 U.S.C. § 409 (suits by and against the Postal Service).  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–02 and its equitable powers.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(C) and 39 U.S.C. § 409 because this is the judicial district in which Plaintiffs State of California and the Bay Area Air Quality Management District reside, and this action seeks relief against agencies and/or officers of the United States.

11.     Pursuant to Civil Local Rules 3-5(b) and 3-2(c), there is no basis for assignment of this action to any particular location or division of this Court.

## PARTIES

12.     Plaintiff STATE OF CALIFORNIA brings this action by and through Attorney General Rob Bonta.  The Attorney General is the chief law enforcement officer of the State and has the authority to file civil actions in order to protect public rights and interests, including actions to protect the natural resources of the State.  Cal. Const. art. V, § 13; Cal. Gov't Code §§ 12511, 12600-12612.  This challenge is brought in part pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the people's interests in protecting the environment and natural resources of the State of California from pollution, impairment, or destruction.  *Id.*; *D'Amico v. Bd. of Med. Exam'rs*, 11 Cal. 3d 1 (1974).

13.     Plaintiff STATE OF NEW YORK brings this action by and through Attorney General Letitia James.  The Attorney General is the chief legal officer of the State of New York and brings this action on behalf of the State and its citizens and residents to protect their interests, and in furtherance of the State's sovereign and proprietary interests in the conservation and protection of the State's natural resources and the environment.

14.     Plaintiff the COMMONWEALTH OF PENNSYLVANIA is a sovereign state of the United States of America.  This action is brought on behalf of the Commonwealth by Attorney General Josh Shapiro, the "chief law officer of the Commonwealth."  Pa. Const. art. IV, § 4.1.  Attorney General Shapiro brings this action on behalf of the Commonwealth pursuant to his statutory authority.  71 Pa. Stat. § 732-204.

15.     Plaintiff STATE OF COLORADO brings this action by and through Attorney General Phil Weiser.  The Attorney General of Colorado is authorized to appear for the State and prosecute and defend all actions in which the State is a party or is interested.  Colo. Rev. Stat. §

4

24-31-101(1)(a) (2021).  Attorney General Phil Weiser brings this action in defense of the State's interest in protecting the public health and environment.

16.  Plaintiff STATE OF CONNECTICUT brings this action by and through Attorney General William Tong.  The Attorney General of Connecticut is generally authorized to have supervision over all legal matters in which the State of Connecticut is a party.  He is also statutorily authorized to appear for the State "in all suits and other civil proceedings, except upon criminal recognizances and bail bonds, in which the State is a party or is interested ... in any court or other tribunal, as the duties of his office require; and all such suits shall be conducted by him or under his direction."  Conn. Gen. Stat. § 3-125.

17.  Plaintiff STATE OF DELAWARE is a sovereign state of the United States of America.  This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941).  Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority.  Del. Code Ann. tit. 29, § 2504.

18.  Plaintiff STATE OF ILLINOIS brings this action by and through Attorney General Kwame Raoul.  The Attorney General is the chief legal officer of the State of Illinois (Ill. Const., art V, § 15) and "has the prerogative of conducting legal affairs for the State." *EPA v. Pollution Control Bd.*, 372 N.E.2d 50, 51 (Ill. Sup. Ct. 1977).  He has common law authority to represent the People of the State of Illinois and "an obligation to represent the interests of the People so as to ensure a healthful environment for all the citizens of the State." *People v. NL Indus.*, 604 N.E.2d 349, 358 (Ill. Sup. Ct. 1992).

19.  Plaintiff STATE OF MAINE brings this action by and through its Attorney General, Aaron M. Frey.  The Attorney General of Maine is a constitutional officer with the authority to represent the State of Maine in all matters and serves as its chief legal officer with general charge, supervision, and direction of the State's legal business.  Me. Const. art. IX, Sec. 11; Me. Rev. Stat. tit. 5, §§ 191 *et seq.*  The Attorney General's powers and duties include acting on behalf of the State and the people of Maine in the federal courts on matters of public interest.  The Attorney General has the authority to file suit to challenge action by the federal government that threatens

the public interest and welfare of Maine residents as a matter of constitutional, statutory, and common law authority.

20.     Plaintiff STATE OF MARYLAND brings this action by and through its Attorney General, Brian E. Frosh.  The Attorney General of Maryland is the State's chief legal officer with general charge, supervision, and direction of the State's legal business.  Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents.  Md. Const. art. V, § 3(a)(2); Md. Code Ann., State Gov't § 6-106.1.

21.     By and through Michigan State Attorney General Dana Nessel, Plaintiff PEOPLE OF THE STATE OF MICHIGAN brings this action to defend their sovereign and proprietary interests.  MCL 14.28.  Conserving Michigan's natural resources is of "paramount public concern."  Mich. Const. art IV, § 52.

22.     Plaintiff STATE OF NEW JERSEY is a sovereign state of the United States of America and brings this action on behalf of itself and as a trustee, guardian and representative of the residents and citizens of New Jersey.  The Attorney General is authorized to file civil suits to vindicate the State's rights and interests, and as he deems necessary to protect the public.  N.J. Stat. Ann. § 52:17A-4; *Alexander v. New Jersey Power & Light Co*., 21 N.J. 373, 380 (1956); N.J. Stat. Ann. § 23:2A-2.  Acting Attorney General Matthew J. Platkin brings this action in defense of the State's sovereign interest to protect the public health and the environment.

23.     Plaintiff STATE OF NEW MEXICO brings this action by and through Attorney General Hector Balderas.  The Attorney General of New Mexico is authorized to prosecute in any court or tribunal all actions and proceedings, civil or criminal, when, in his judgment, the interest of the State requires such action.  NMSA 1978, § 8-5-2.  Under the Constitution of New Mexico, "protection of the state's beautiful and healthful environment is ... declared to be of fundamental importance to the public interest, health, safety and the general welfare."  N.M. Const. art. XX, § 21.  This provision "recognizes that a public trust duty exists for the protection of New

Mexico's natural resources ... for the benefit of the people of this state." *Sanders-Reed ex rel.*

*Sanders-Reed v. Martinez*, 350 P.3d 1221, 1225 (N.M. Ct. App. 2015).

24.  Plaintiff STATE OF NORTH CAROLINA brings this action by and through Attorney General Joshua H. Stein.  The North Carolina Attorney General is the chief legal officer of the State of North Carolina.  The Attorney General is empowered to appear for the State of North Carolina "in any cause or matter … in which the state may be a party or interested."  N.C. Gen. Stat. § 114-2(1).  Moreover, the Attorney General is authorized to bring actions on behalf of the citizens of the state in "all matters affecting the public interest."  *Id.* § 114-2(8)(a).

25.  Plaintiff STATE OF OREGON brings this suit by and through Attorney General Ellen Rosenblum.  The Oregon Attorney General is the chief legal officer of the State of Oregon. The Attorney General's duties include acting in federal court on matters of public concern and upon request by any State officer when, in the discretion of the Attorney General, the action may be necessary or advisable to protect the interests of the State.  Ore. Rev. Stat. § 180.060(1).

26.  Plaintiff STATE OF RHODE ISLAND brings this action by and through Attorney General Peter F. Neronha.  The Attorney General is the chief law enforcement officer of the State and has the authority to file civil actions in order to protect public rights and interests, including actions to protect the natural resources of the State.  R.I. Const. art. I, § 17; R.I. Gen. Laws R.I. § 10-20-1, *et seq.*  This challenge is brought in part pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the people's interests in protecting the environment and natural resources of the State of Rhode Island from pollution, impairment, or destruction.  *Id.; Newport Realty, Inc. v. Lynch*, 878 A.2d 1021 (R.I. 2005).

27.  Plaintiff STATE OF VERMONT brings this action by and through Attorney General Thomas J. Donovan, Jr.  The Attorney General is the chief legal officer of the State of Vermont. *See* Vt. Stat. Ann. tit. 3, § 152 ("The Attorney General may represent the State in all civil and criminal matters as at common law and as allowed by statute.").  Vermont is a sovereign entity and brings this action to protect its own sovereign and proprietary rights.  The Attorney General's powers and duties include acting in federal court on matters of public concern.  This challenge is

1    brought pursuant to the Attorney General's independent constitutional, statutory, and common
2    law authority to bring suit and obtain relief on behalf of the State of Vermont.

3        28.    Plaintiff STATE OF WASHINGTON is a sovereign entity and brings this action to
4    protect its sovereign and proprietary rights by and through its Attorney General, Robert W.
5    Ferguson.  The Attorney General is the chief legal adviser to the State of Washington, and his
6    powers and duties include acting in federal court on matters of public concern.  *See* WASH. REV.
7    CODE § 43.10.030.  This challenge is brought pursuant to the Attorney General's statutory
8    authority to bring suit and obtain relief on behalf of the State of Washington.

9        29.    Plaintiff the DISTRICT OF COLUMBIA is a municipal corporation empowered to
10   sue and be sued and is the local government for the territory constituting the permanent seat of the
11   government of the United States.  The District is represented by and through its chief legal
12   officer, the Attorney General for the District of Columbia, Attorney General Karl Racine.  The
13   Attorney General has general charge and conduct of all legal business of the District and all suits
14   initiated by and against the District and is responsible for upholding the public interest.  D.C.
15   Code § 1-301.81(a)(1).

16       30.    Plaintiff the CITY OF NEW YORK brings this action by and through the Corporation
17   Counsel Hon. Sylvia O. Hinds-Radix.  The Corporation Counsel is the chief legal officer of the
18   City of New York and brings this action on behalf of the City and its residents to protect New
19   York City's sovereign and proprietary interest in the conservation and protection of its natural
20   resources and the environment and the health of its residents.  *See* New York City Charter Chap.
21   17, § 394.

22       31.    Plaintiff BAY AREA AIR QUALITY MANAGEMENT DISTRICT ("BAAQMD"),
23   acting to protect the public health, welfare, and resources of the State of California, brings this
24   action by and through its Acting District Counsel, Adan A. Schwartz.  BAAQMD is a body
25   corporate and politic, organized pursuant to Chapter 4 of Part 3 of Division 26 of the California
26   Health and Safety Code ("Health & Saf.") with the power to bring this action in its own name and
27   on behalf of the People of the State of California.  Health & Saf. Code §§ 40700, 40701 and
28   42403(a).  BAAQMD is the governmental agency charged with the primary responsibility for

8

controlling air pollution from non-vehicular sources, adopting and enforcing BAAQMD rules and regulations relating to air pollution, and maintaining healthy air quality in the San Francisco Bay Area.  Health & Saf. Code §§ 39002, 40000, 40200, 40702 and 42402.

32.     Plaintiffs have a strong interest in preventing the adverse environmental and public health impacts of fossil fuel development and combustion, including air quality degradation and public health harms associated with the use of fossil fuel powered vehicles.  Not only does the transportation sector account for a significant percentage of emissions of both criteria pollutants and greenhouse gases, but Postal Service facilities are often located within environmental justice communities that are exposed to disproportionate emissions from mail delivery vehicles.  For example, in the San Francisco Bay Area, tailpipe emissions from 5.3 million light duty vehicles account for approximately 31% of the region's carbon monoxide and 12% of its nitrogen oxides, as well as 28% of the region's greenhouse gas emissions.  The Postal Service operates a major mail distribution facility at 675 7th Street in West Oakland, a site that contributes to the heavy pollution burden already experienced in neighboring communities from industrial facilities, an adjacent port, highways, and distribution centers.  The Postal Service's San Francisco Processing & Distribution Center is located in the Bayview neighborhood, where the population is predominantly Black, Hispanic or Latino, and Asian, and which is already overburdened by air pollution and the related negative health effects from multiple industrial facilities operating in and around the neighborhood.

33.     Transportation is currently the largest in-state source of greenhouse gas emissions in Delaware, as well as a significant source of carbon monoxide, nitrous oxide, and particulate matter, which disproportionately affects communities near highways and industrial centers.

34.     Likewise, in New York City, a 2016 study estimated that fine particulate (PM 2.5) emissions from vehicle traffic alone caused 320 premature deaths in the City each year (5,850 life years lost), as well as 870 asthma-related emergency room visits and cardiovascular or respiratory hospitalizations.[1]  The health impacts were especially severe in neighborhoods where poverty is

---

[1] *See* Iyad Kheirbek, *et al.*, *The contribution of motor vehicle emissions to ambient fine particulate matter public health impacts in New York City: a health burden assessment*,

First Amended Complaint for Declaratory and Injunctive Relief – Case No. 3:22-cv-02583-JD

1  very high, such as East New York, Brooklyn, where a major Postal Service distribution facility is

2  located at 1050 Forbell Street.  Those neighborhoods are burdened with 70% more PM 2.5

3  emissions from trucks and buses, and over eight times as many asthma-related emergency room

4  visits attributable to those emissions, compared to low poverty neighborhoods.

5      35.    Plaintiffs also have a strong interest in preventing and mitigating harms that climate

6  change poses to human health and the environment, including increased heat-related deaths,

7  damaged coastal areas, increased wildfire risk, disrupted ecosystems, more severe weather events,

8  and longer and more frequent droughts.  *See Massachusetts v. EPA*, 549 U.S. 497, 521 (2007).

9  For example, California is already experiencing the adverse effects of climate change, including

10  increased risk of wildfires, a decline in the average annual snowpack that provides approximately

11  35 percent of the State's water supply, increased erosion of beaches and low-lying coastal

12  properties from rising sea levels, and increased formation of ground-level ozone (also known as

13  smog), which is linked to asthma, heart attacks, and pulmonary problems, especially in children

14  and the elderly.  In Washington, warmer temperatures have led to diminished snowpack, harming

15  downstream communities that rely on snowmelt for hydroelectric power, drinking water, and

16  agriculture.[2]

17      36.    For these reasons, among others, Plaintiffs have long been leaders in adopting laws

18  and plans to reduce greenhouse gas emissions and slow the pace of climate change, including

19  policies to promote the electrification of the transportation sector.

20      37.    For example, California's laws and plans include (1) California's statutory target of

21  reducing greenhouse gas emissions by 40 percent below 1990 levels by 2030, Cal. Health &

22  Safety Code § 38566; (2) the California Air Resources Board's plan to reduce fossil fuel

23  consumption by 45 percent by 2030 to meet this target; (3) California's policies to phase out the

24  sale of new conventional passenger cars and trucks by 2035 and achieve 100% zero-emission

25

26  Environmental Health Vol. 15, Article 89 (2016), https://doi.org/10.1186/s12940-016-0172-6
   (article) and https://a816-dohbesp.nyc.gov/IndicatorPublic/Traffic/index.html (infographic).

27  [2] *See* H.A. Roop, *et al.*, Univ. Wash. Climate Impacts Group, *Shifting Snowlines and Shorelines*
   (2020), https://cig.uw.edu/wp-

28  content/uploads/sites/2/2020/02/CIG_SnowlinesShorelinesReport_2020.pdf.

medium and heavy duty vehicle sales by 2045, Executive Order N-79-20; and (4) California's policy to achieve carbon neutrality by 2045, Executive Order B-55-18.  Local requirements are often complementary or stricter.  For example, the Bay Area Air Quality Management District has set a target that 90 percent of vehicles in the Bay Area should be zero emissions by 2050, with an interim target of 1.5 million such vehicles by 2030.  Access to electric vehicle charging stations will increase as governments work to meet these targets.

38.     Connecticut must reduce the level of greenhouse gas emissions in the state by at least 45 percent below the 2001 level by 2030 and by at least 80 percent below the 2001 level by 2050.  Conn. Gen. Stat. § 22a-200a(a).

39.     Pursuant to the Climate Leadership and Community Protection Act, New York must reduce economy-wide greenhouse gas emissions 40 percent below 1990 levels by 2030 and at least 85 percent below 1990 levels by 2050.  *See* N.Y. Envtl. Conserv. L. § 75-0107(1).

40.     Washington must reduce overall greenhouse gas emissions in the state by 45 percent below 1990 levels by 2030.  Wash. Rev. Code § 70A.45.020(1)(a)(ii).

41.     In response to the dangers posed by greenhouse gases, New Mexico has enacted an Energy Transition Act, which sets standards for electric utilities of 50% renewable energy by 2030, 80% by 2040, and zero-carbon resources by 2050.

42.     Pennsylvania has adopted a Climate Action Plan to comply with the governor's commitment to reach a 26 percent reduction in greenhouse gases by 2025 and an 80 percent reduction by 2050.  Executive Order 2019-01.[3]

43.     In Rhode Island, these laws and plans include, among others:  Rhode Island's 2021 Act on Climate which, *inter alia*, mandates greenhouse gas emission reductions to forty-five percent (45%) below 1990 levels by 2030; eighty percent (80%) below 1990 levels by 2040, and to net-zero emissions by 2050.  *See* R.I. Gen Laws § 42-6.2-9.  As of 2026, there will be a statutory right to bring actions, including actions against the State and its agencies, for failure to comply with the 2021 Act on Climate.  *See* R.I. Gen Laws § 42-6.2-9.

---

[3] https://www.governor.pa.gov/newsroom/executive-order-2019-01-commonwealth-leadership-in-addressing-climate-change-and-promoting-energy-conservation-and-sustainable-governance/ and https://www.dep.pa.gov/Citizens/climate/Pages/PA-Climate-Action-Plan.aspx.

44.     Effective June 1, 2022, Maryland law requires the State to reduce greenhouse gas emissions 60 percent below 2006 levels by 2031, and to achieve net-zero greenhouse gas emissions by 2045.  Climate Solutions Now Act of 2022, 2022 Md. Laws, ch. 38, §§ 3-4.

45.     The City of New York has committed to reducing greenhouse gas emissions 80 percent below 2005 levels by 2050, *see* NYC Admin. Code § 24-803, and has issued numerous plans describing its path to achieving this goal, all of which call for increased electrification of the transportation sector.

46.     The Postal Service failed to consider the impacts of its decision on state and local government laws and policies.  The Postal Service's procurement of a new gas-powered fleet will adversely impact Plaintiffs by continuing substantial and unnecessary emissions of air pollutants, including greenhouse gases; adversely affecting public health; and undermining and increasing the costs of Plaintiffs' efforts to address these critical problems.

47.     Plaintiffs also rely upon the Postal Service's compliance with the procedural requirements of NEPA in order to obtain timely and accurate information about activities that may have significant adverse effects on the environment, so that Plaintiffs and their residents can meaningfully participate in the decisionmaking process.  The Postal Service's failure to comply with NEPA adversely affects Plaintiffs by thwarting public participation and by failing to adequately protect the environment.  An adequate NEPA review that identifies and evaluates those impacts would provide additional information that could result in a different decision regarding the program – a termination of the program, modification of the program, or other mitigations that would redress Plaintiffs' injuries.

48.     Therefore, Plaintiffs have suffered legal wrong because of the Postal Service's action, have been adversely aggrieved by the approval of the Final EIS and Record of Decision, and have standing to bring this action.

49.     Defendant UNITED STATES POSTAL SERVICE is "an independent establishment of the executive branch" of the U.S. government, 39 U.S.C. § 201, and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

1       50.    Defendant LOUIS DeJOY is the United States Postmaster General and bears

2    responsibility, in whole or in part, for the acts complained of in this Complaint.

3                          **STATUTORY BACKGROUND**

4    **I.**     **NATIONAL ENVIRONMENTAL POLICY ACT.**

5       51.    NEPA "is our basic national charter for protection of the environment." *Ctr. for*

6    *Biological Diversity v. Bernhardt*, 982 F.3d 723, 734 (9th Cir. 2020).  NEPA has two

7    fundamental purposes: (1) to guarantee that an agency takes a "hard look" at the consequences of

8    its actions before the action occurs by ensuring that "the agency, in reaching its decision, will

9    have available, and will carefully consider, detailed information concerning significant

10    environmental impacts," and (2) to ensure that "the relevant information will be made available to

11    the larger audience that may also play a role in both the decisionmaking process and the

12    implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332,

13    349-50 (1989).

14       52.    To achieve these purposes, NEPA requires the preparation of a detailed EIS for any

15    "major federal action significantly affecting the quality of the human environment."  42 U.S.C.

16    § 4332(2)(C).  In preparing the EIS, NEPA requires federal agencies to take a "hard look," which

17    involves considering the direct, indirect, and cumulative impacts of their proposed actions.  *Idaho*

18    *Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002).  When a proposed action has a

19    potential adverse impact on minority or low-income populations, agencies should include an

20    environmental justice analysis as part of this "hard look" under NEPA.  *See* Exec. Order No.

21    12898, § 1-101, 59 Fed. Reg. 7,629 (Feb. 16, 1994); *Vecinos para el Bienestar de la Comunidad*

22    *Costera v. FERC*, 6 F.4th 1321, 1330 (D.C. Cir. 2021) (reviewing challenge to agency's

23    environmental justice analysis under NEPA).  Moreover, "an agency may not rely on incorrect

24    assumptions or data." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th

25    Cir. 2005).  Fundamentally, these "disclosure requirement[s] obligate the agency to make

26    available to the public high quality information, including accurate scientific analysis, expert

27    agency comments and public scrutiny, before decisions are made and actions are taken." *Ctr. for*

28    *Bio. Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167 (9th Cir. 2003).

53.     NEPA further requires that federal agencies provide a "detailed statement" regarding the "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii). This requirement "lies at the heart of any NEPA analysis." *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 459 F. Supp. 2d 874, 905 (N.D. Cal. 2006). Agencies must explore and evaluate all reasonable alternatives that relate to the purposes of the project, and must briefly discuss the reasons for eliminating any alternatives from detailed study. *See* 40 C.F.R. § 1502.14. The existence of "a viable but unexamined alternative renders [an] environmental impact statement inadequate." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999).

54.     A fundamental requirement of NEPA is that an agency must not commit resources to a particular course of action prior to completing its environmental review. *See* 40 C.F.R. § 1502.2(f) ("Agencies shall not commit resources prejudicing selection of alternatives before making a final decision"), *see also id*. § 1506.1 (headed "Limitations on actions during NEPA process"). The Ninth Circuit has construed this requirement "as requiring agencies to prepare NEPA documents ... before any irreversible and irretrievable commitment of resources." *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000). "The point of commitment" constituting an irreversible and irretrievable commitment of resources can occur when an agency "sign[s] the contract" with a project proponent "and then work[s] to effectuate the Agreement." *Id*.

55.     The Postal Service is an "independent establishment of the executive branch of the Government of the United States," 39 U.S.C. § 201, and, as an agency of the federal government, the Postal Service is subject to the requirements of NEPA. 42 U.S.C. § 4332; 40 C.F.R. § 1500.3(a); *see Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140 (9th Cir. 2000); *Chelsea Neighborhood Ass'ns v. U.S. Postal Serv.*, 516 F.2d 378 (2d Cir. 1975).

56.     The Postal Service has recognized its NEPA obligations by, among other things, promulgating agency-specific NEPA procedures in 39 C.F.R. Part 775, in which the Postal Service recognizes its responsibilities to "[i]nterpret and administer applicable policies, regulations, and public laws of the United States in accordance with the policies set forth in [NEPA] and the NEPA Regulations . . . ." 39 C.F.R. §§ 775.2(a). These regulations stress that the Postal Service's policy is to "[e]mphasize environmental issues and alternatives in the

14

consideration of proposed actions," to "identify and assess reasonable alternatives to proposed actions in order to avoid or minimize adverse impacts on the environment," and to "[u]se all practicable means to protect, restore, and enhance the quality of the human environment." *Id.* § 775.2(c), (e), (f).  In addition, the regulations state that the consideration of alternatives in an EIS "is vitally important." *Id.* § 775.11(c)(5).

57.    Courts review the Postal Service's compliance with NEPA under an arbitrary and capricious standard of review.  *See Akiak*, 213 F.3d at 1144.

## II.    POSTAL SERVICE HISTORY, OPERATIONS, AND GOVERNING LAWS.

58.    The United States Constitution empowers Congress to "establish Post Offices and post Roads."  U.S. Const., art. I, § 8, cl. 7.  In 1789, Congress established the first Post Office under the Constitution and made the Postmaster General subject to the President's direction.  U.S. Postal Serv., The United States Postal Service: An American History 1, 4 (2020), https://about.usps.com/publications/pub100.pdf.

59.    The Postal Service has played "a vital yet largely unappreciated role in the development of" the United States.  *U.S. Postal Serv. v. Council of Greenburgh Civic Assocs.*, 453 U.S. 114, 121 (1981).  During the early years of this country's development, "the Post Office was to many citizens situated across the country the most visible symbol of national unity."  *Id.* at 122.  Since its beginnings in the pre-Revolutionary period, the Postal Service "has become the nation's oldest and largest public business."  *U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 739 (2004) (citations and quotations omitted).

60.    Since its founding, "the Postal Service's efforts to deliver mail quickly and reliably have been a force for innovation in the American transportation sector."  USPS Office of Inspect. Gen., *Electric Delivery Vehicles and the Postal Service*, at 3 (Mar. 17, 2022).  The Postal Service has spurred nationwide adoption of the stagecoach, nationwide expansion of railroads, nationwide use of air transportation, and the development of electric vehicles.  *Id.*

61.    In 1970, Congress passed the Postal Reorganization Act ("PRA"), *see* Pub. L. No. 91-375, 84 Stat. 719, in large part to "convert the Post Office Department into an independent

establishment in the Executive Branch of the Government freed from direct political pressures."

H.R. Rep. No. 91-1104, at 1 (1970) (Conf. Rep.), *as reprinted in* 1970 U.S.C.C.A.N. 3649, 3650.

62.    The PRA renamed the agency the U.S. Postal Service, restructured its operations, removed it from the Cabinet to ensure its political independence, provided that the Postmaster General would be appointed by a newly-established Board of Governors rather than the President, and stated it had the power "to sue and be sued in its official name." 39 U.S.C. § 401(a).  The PRA provides that "[t]he United States Postal Service shall be operated as a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people." *Id*. § 101(a).  The PRA further affirms that the Postal Service's "basic function" is "to bind the Nation together through the personal, educational, literary, and business correspondence of the people." *Id*.  To do so, the Postal Service "shall render postal services to all communities." *Id*.

63.    The Postal Service operates around the clock to process and deliver mail via a highly integrated and complex system through which an average of 425 million pieces of mail moved every day.  U.S. Postal Serv., Fun Facts, 1 Day in the Postal Service, https://facts.usps.com/one-day/.  The Postal Service delivers to "more than 163 million city, rural, PO Box and highway delivery points."  U.S. Postal Serv., FY 2021 Annual Report to Congress 14, https://about.usps.com/what/financials/annual-reports/fy2021.pdf.

64.    The Postal Service touches the lives of virtually all people in the United States.  For example, 18 percent of Americans, and 40 percent of senior citizens, pay their bills via the mail. Nearly 20 percent of Americans who receive tax refunds do so through the mail.[4]  The Department of Veterans Affairs fills about 80 percent of veterans' prescriptions by mail, sending 120 million prescriptions a year.  Every day, more than 330,000 veterans receive a package of prescriptions in the mail.[5]  More than half of the people who receive medication by mail are over

---

[4] Sam Berger & Stephanie Wylie, *Trump's War on the Postal Service Hurts All Americans*, Ctr. For Am. Progress (Aug. 19, 2020), https://www.americanprogress.org/issues/democracy/news/2020/08/19/489664/trumps-war-postal-service-hurts-americans/.
[5] Hope Yen, "Lawmakers: Postal changes delay mail-order medicine for vets," ABC News (Aug. 14, 2020), https://abcnews.go.com/Politics/wireStory/lawmakers-postal-delay-mail-order-medicine-vets-72374343.

the age of 65.  In rural areas, where more than a third of post offices are located and where private mail carriers often do not deliver, the Postal Service provides a vital link to more than 14 million people without broadband access.  In 2020, the Postal Service delivered approximately 543 million pieces of election mail, including 135 million ballots, allowing millions of Americans to securely vote in local, state, and national elections.  U.S. Postal Serv., FY 2021 Annual Report to Congress, at 22-23.

65.    The PRA provides that it "shall be the responsibility of the Postal Service to maintain an efficient system of collection, sorting, and delivery of the mail nationwide."  39 U.S.C. § 403(b)(1).  The PRA further requires that "[i]n selecting modes of transportation, the Postal Service shall give highest consideration to the prompt and economical delivery of all mail.  Modern methods of transporting mail by containerization and programs designed to achieve  overnight transportation to the destination of important letter mail to all parts of the Nation shall be a primary goal of postal operations."  39 U.S.C. § 101(f).

66.    The Postal Service has adopted new transportation technologies when necessary to carry out its mission—from boats, to airplanes, to motorized delivery vehicles.  U.S. Postal Serv., The United States Postal Service: An American History, at 12-24, 40, 57, 80-81, 110-118.

67.    In 2021, the Postal Service had 212,327 delivery and collection vehicles in its inventory.  U.S. Postal Serv., FY 2021 Annual Report to Congress, at 28.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    THE POSTAL SERVICE'S NEXT GENERATION VEHICLE DELIVERY ACQUISITIONS PROGRAM.

68.    The Postal Service has one of the largest civilian vehicle fleets in the world, consisting of approximately 212,000 vehicles that are on the road delivering mail at least six days per week to more than 163 million delivery points in every community in the United States.  Most of these vehicles, known as Long Life Vehicles, were manufactured between 1986 and 1994 and are now beyond their intended service life and becoming increasingly expensive and dangerous to operate and maintain.

69.    To address this problem, the Postal Service launched its Next Generation Delivery Vehicle Acquisitions program to evaluate, test, and eventually purchase up to 165,000 new purpose-built vehicles over the next ten years.

70.    On February 23, 2021, the Postal Service announced a contract award to a defense contractor, Oshkosh Defense, LLC ("Oshkosh"), for the future production of these vehicles.  The contract covers non-recurring engineering and tooling costs and allows the Postal Service to order between 50,000 and 165,000 Next Generation Delivery Vehicles over a ten-year period.  The Postal Service has claimed that the contract requires the company to be able to support two powertrain alternatives: (1) a modern and efficient internal combustion engine, and (2) a battery electric vehicle powertrain.  At the time the contract was awarded, though, Oshkosh did not manufacture any electric vehicles.  The contract was allegedly "contingent on the satisfactory completion of the NEPA process."  However, the Postal Service provided as much as $482 million to Oshkosh under the contract prior to initiating the NEPA process.

71.    In June 2021, Oshkosh announced that it would open a new facility in Spartanburg, South Carolina, to construct vehicles for the Postal Service under this contract.

## II.    NEPA PROCESS FOR THE PROGRAM.

72.    On August 26, 2021, the Postal Service announced the availability of a draft EIS for its Proposed Action—namely, to "purchase and deploy[] up to 165,000 Next Generation Delivery Vehicles ("NGDVs") over a ten-year period."  *See* 86 Fed. Reg. 47,662 (Aug. 26, 2021).  The stated purpose and need of the Proposed Action in the draft EIS were "to replace the end-of-life and high-maintenance long life vehicles ("LLVs") and flexible fuel vehicles ("FFVs") with vehicles with more energy-efficient powertrains, updated technology, reduced emissions, increased cargo capacity and improved loading characteristics, improved ergonomics and carrier safety, and reduced maintenance costs," and "to enable the Postal Service to meet its Congressional mandate to maintain efficient nationwide delivery of the mail and to provide prompt, reliable, and efficient services to patrons."

73.    In evaluating the Proposed Action and alternatives, the Draft EIS considered (1) the purchase and deployment of custom-made vehicles with 90% gas-powered, internal-combustion

engines and 10% electric vehicles (Alternative 1, or the "Preferred Alternative"); (2) the purchase and deployment of 100% custom-made electric vehicles (a different "scenario" under Alternative 1); (3) an alternative of purchasing 100% commercial off-the-shelf gas-powered vehicles with right-hand drive (Alternative 1.1); (4) an alternative of purchasing 100% commercial off-the-shelf electric vehicles with left-hand drive (Alternative 1.2); and (5) the required "No Action Alternative" of attempting to maintain the Postal Service's existing fleet.

74.    The Postal Service accepted comments on the draft EIS until October 18, 2021. Comments critical of the Draft EIS were submitted by the United States Environmental Protection Agency ("EPA"), the Bay Area Air Quality Management District, the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, and several non-governmental organizations, among others.

75.    For example, EPA explained that while the Postal Service identified a clear need to update its vehicle fleet, "we do not believe a proper analysis was conducted that would support the Postal Service's preferred alternative."  In particular, EPA stated that the draft EIS lacked adequate data and presented biased cost and emissions estimates to support its Preferred Alternative, thereby precluding "meaningful consideration of the proposed action and alternatives."

76.    The Bay Area Air Quality Management District also commented that the 10 percent electric requirement in the Preferred Alternative was insufficient, given that this proposal (1) would negatively impact the region's progress in improving local air quality and reducing GHG emissions, especially in vulnerable communities; (2) did not reflect current and rapidly expanding electric vehicle technology; (3) would unnecessarily delay the transition to clean technologies, and (4) would likely cost the Postal Service and taxpayers more money in the long term because gas-powered vehicles are more expensive than electric vehicles to operate and maintain.

77.    On January 7, 2022, the Postal Service released the Final EIS with minimal changes from the draft EIS.  87 Fed. Reg. 994 (Jan. 7, 2022).

78.    In the Final EIS, the Postal Service decide to move forward with its Preferred Alternative of procuring custom-made, right-hand-drive delivery vehicles with 90 percent internal

19

combustion engines and 10 percent battery electric vehicles.  The Final EIS noted that the actual delivery vehicle types purchased would be contingent, in part, "upon the supplier's production and delivery capabilities."

79.    The Final EIS stated that the Preferred Alternative was chosen because battery electric vehicles involved a higher total cost of ownership and would have limited range rendering their use infeasible on longer rural routes, despite comments and evidence submitted to the agency contradicting these conclusions.  In fact, the Final EIS assumes fuel costs for gas-powered vehicles of $2.19 per gallon, grossly underestimating even current gasoline prices, let alone future ones.  The Final EIS rejected an alternative of 100 percent battery electric vehicles as infeasible, and evaluated no other percentage of electric powertrains between the 10 percent it selected and the 100 percent it rejected.

80.    The Final EIS relied on acquisition and maintenance cost data at least in part based on the contract awarded to Oshkosh, which was not provided to the public, despite requests for the Postal Service to make this information public as required by NEPA.

81.    The Final EIS failed to fully evaluate environmental justice impacts from the program.

82.    The Final EIS did not evaluate environmental impacts from the construction and renovation of the Spartanburg, South Carolina production facility that Oshkosh had announced would be built to meet the demands of its contract.

83.    The Final EIS did not consider the inconsistency of the Preferred Alternative with State and local laws and plans that require reductions in greenhouse gas emissions and fossil fuel consumption, including from the transportation sector.

84.    On February 2, 2022, EPA Associate Administrator Vicky Arroyo wrote to the Postal Service to express the agency's disapproval of the Final EIS.  In particular, EPA wrote that its "concerns with the draft EIS were not adequately addressed and the final EIS remains seriously deficient," and "preparation of a supplemental EIS is particularly important to maintain the integrity of the NEPA process."  For example, using well-established metrics for estimating

1    greenhouse gas emissions, EPA calculated that carbon dioxide emissions from the use of gas-

2    powered vehicles would be 2.5 times greater than what the Postal Service had estimated.

3        85.    On the same day, the White House Council on Environmental Quality ("CEQ"), the

4    federal agency responsible for implementing NEPA, wrote to the Postal Service to express similar

5    concerns.  In a letter addressed to Defendant DeJoy, CEQ Chair Brenda Malloy reiterated EPA's

6    "grave concerns" with the adequacy of the Final EIS, criticized the Postal Service's decision to

7    contract with Oshkosh prior to completing the NEPA review, and urged the Postal Service to redo

8    its analysis.

9        86.    On February 4, 2022, these concerns were echoed in a letter to the Postal Service

10   signed by several members of Congress, who wrote to express "strong opposition to the failure of

11   the United States Postal Service (USPS) to plan to electrify its fleet of mail delivery vehicles and

12   contribute to the fight against climate change."  The letter continued:  "After an unjustifiable,

13   truncated, and deficient process, it is unacceptable that the USPS intends to cling to an

14   overwhelmingly fossil fuel-powered fleet whose emissions are endangering our planet."

15       87.    On February 23, 2022, the Postal Service signed the Record of Decision, which

16   finalized the NEPA process, incorporated the findings and analysis of the Final EIS, and

17   announced the agency's determination that it would implement the Preferred Alternative.  *See* 87

18   Fed. Reg. 14,588 (Mar. 15, 2022).

19       88.    On March 17, 2022, the United States Postal Service Office of Inspector General

20   released a report titled "Electric Delivery Vehicles and the Postal Service," which found that

21   "electric vehicle technology is generally capable of meeting the Postal Service's needs" and is

22   generally more cost-effective than using gas-powered vehicles.  Contrary to the findings in the

23   Final EIS and Record of Decision, the Inspector General found that the average 24-mile postal

24   route was well within the ability of current electric vehicle technology, and even the 2 percent of

25   routes that are 70 miles or longer could be more suited to electric vehicles because the Postal

26   Service saves money on each mile driven compared to gas-powered vehicles.

27

28

**FIRST CAUSE OF ACTION**

**(Violation of NEPA:**

**Irreversible Commitment of Resources**

**42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.2(f); 39 C.F.R. § 775.11(b)(2)(vi))**

89.   Paragraphs 1 through 88 are realleged and incorporated herein by reference.

90.   Plaintiffs have a right of action to declare unlawful and set aside agency action that is arbitrary and capricious, exceeds the agency's statutory authority, and violates NEPA.

91.   A fundamental requirement of NEPA is that agencies must not commit resources to a particular course of action prior to completing their environmental review. *See* 40 C.F.R. § 1502.2(f) ("Agencies shall not commit resources prejudicing selection of alternatives before making a final decision"), *see also id*. § 1506.1 (Limitations on actions during NEPA process); 39 C.F.R. § 775.11(b)(2)(vi) (EIS must "[s]erve to assess the environmental impact of proposed actions, rather than to justify decisions already made"). As the Ninth Circuit has found, agencies are required to prepare NEPA documents "*before* any irreversible and irretrievable commitment of resources." *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000) (emphasis added). "The point of commitment" constituting an irreversible and irretrievable commitment of resources can occur when an agency "sign[s] the contract" with a project proponent "and then work[s] to effectuate the Agreement." *Id*.

92.   Here, the Postal Service awarded a contract for the manufacture of Next Generation Delivery Vehicles to Oshkosh in February 2021, roughly six months before the agency even issued its Draft EIS, and a year before it finalized the EIS and issued the Record of Decision. The Final EIS states that "[a]t the time of awarding the contract, the Postal Service placed an order that funds the production design, assembly tooling, and factory start-up costs to support the production of both vehicle types in parallel" – even though Oshkosh had only minimal experience producing electric vehicles. The Final EIS notes that the type of vehicles ultimately purchased will, in part, "be contingent upon the supplier's production and delivery capabilities." According

1  to CEQ, the Postal Service committed more than $480 million to begin engineering and factory
2  construction for its procurement decision before completing this NEPA process.

3       93.    In the Record of Decision, the Postal Service incorporated the Final EIS's findings
4  and analysis and determined that it would implement the Preferred Alternative.

5       94.    Accordingly, the Postal Service's issuance of the Final EIS and Record of Decision
6  was arbitrary and capricious, did not demonstrate reasoned decision-making, exceeded the Postal
7  Service's statutory authority, and was contrary to the requirements of NEPA, 42 U.S.C. §
8  4332(2)(C), 40 C.F.R. § 1502.2(f), and 39 C.F.R. § 775.11(b)(2)(vi), the Final EIS and Record of
9  Decision should be held unlawful and set aside, and the Postal Service should be enjoined from
10  taking action under its Next Generation Delivery Vehicle Acquisitions program until it has
11  complied with NEPA.

12  **SECOND CAUSE OF ACTION**
13  **(Violation of NEPA:**
14  **Failure to Consider Reasonable Alternatives**
15  **42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.14; 39 C.F.R. § 775.11(c)(5))**

16       95.    Paragraphs 1 through 94 are realleged and incorporated herein by reference.

17       96.    Plaintiffs have a right of action to declare unlawful and set aside agency action that is
18  arbitrary and capricious, exceeds the agency's statutory authority, and violates NEPA.

19       97.    NEPA requires that Defendants provide a "detailed statement" regarding the
20  "alternatives to the proposed action."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.14(a); 39 C.F.R.
21  § 775.11(c)(5); *see also* 30 C.F.R. §§ 775.8(a)(4), 775.11(b)(2)(iv)-(v).  The requirement to
22  consider reasonable alternatives "lies at the heart of any NEPA analysis."  *California ex rel.*
23  *Lockyer v. U.S. Dept. of Agric.*, 459 F. Supp. 2d 874, 905 (N.D. Cal. 2006).  "The existence of a
24  viable but unexamined alternative renders" an EIS inadequate.  *W. Watersheds Project v. Abbey*,
25  719 F.3d 1035, 1050 (9th Cir. 2013) (internal quotations and citations omitted).

26       98.    Here, the Postal Service failed to consider reasonable alternatives to its Preferred
27  Alternative of procuring 90% gas-powered vehicles and 10% electric vehicles.

28

99.    While the Postal Service put forward 100% electric vehicle alternatives for both custom-made and commercial off-the-shelf vehicles, it summarily rejected these alternatives as impractical and infeasible without any legitimate justification for doing so.  The Postal Service claims to have identified at least 12,500 delivery routes where length, environmental conditions, or facility constraints do not allow for electric vehicles.  However, these routes account for only 5% of the agency's total delivery routes, and the Postal Service's assumptions regarding the infeasibility of using electric vehicles for the vast majority of its routes have no factual basis.  The Postal Service unreasonably failed to consider alternatives that would have involved a greater mix of electric vehicles that could still meet its delivery needs.

100.   Nor does the Postal Service's reliance on alleged cost constraints provide a legitimate basis for its failure to consider reasonable alternatives under NEPA.

101.   In the Record of Decision, the Postal Service incorporated the Final EIS's findings and analysis and determined that it would implement the Preferred Alternative.

102.   Accordingly, the Postal Service's issuance of the Final EIS and Record of Decision was arbitrary and capricious, did not demonstrate reasoned decision-making, exceeded the Postal Service's statutory authority, and was contrary to the requirements of NEPA, 42 U.S.C. § 4332(2)(C), 40 C.F.R. § 1502.14, and 39 C.F.R. § 775.11(c)(5), the Final EIS and Record of Decision should be held unlawful and set aside, and the Postal Service should be enjoined from taking action under its Next Generation Delivery Vehicle Acquisitions program until it has complied with NEPA.

**THIRD CAUSE OF ACTION**

**(Violation of NEPA:**

**Failure to Take a "Hard Look"**

**42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.16(a)(1); 39 C.F.R. § 775.11(c)(6))**

103.   Paragraphs 1 through 102 are realleged and incorporated herein by reference.

104.   Plaintiffs have a right of action to declare unlawful and set aside agency action that is arbitrary and capricious, exceeds the agency's statutory authority, and violates NEPA.

105.  As discussed above, a fundamental requirement of NEPA is that federal agencies take a "hard look" at the environmental consequences of a proposed activity before acting.  *See* 42 U.S.C. § 4332; *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350 (1989) ("The sweeping policy goals" of NEPA are "realized through a set of action-forcing procedures that require that agencies take a hard look at environmental consequences, and that provide for broad dissemination of relevant environmental information") (cleaned up).  When preparing an EIS, an agency must disclose and consider any "environmental impacts of the proposed action and reasonable alternatives to the proposed action and the significance of those impacts."  40 C.F.R. § 1502.16(a)(1); 42 U.S.C. § 4332(2)(C); 39 C.F.R. § 775.11(c)(6); *see also* 40 C.F.R. § 1508.1(g).

106.  Here, the Final EIS fails to take the required "hard look" at numerous environmental impacts from the Proposed Action and alternatives, including impacts related to air quality, environmental justice, and climate.  Instead, the Final EIS simply assumes that because there will be no change to the overall number of vehicles and because the agency will ultimately be replacing older model vehicles with more fuel-efficient engines, there will be no negative impacts.  This analysis is flawed for several reasons.

107.  The Final EIS fails to properly consider the specific impacts of continued fossil fuel use on environmental justice communities that are located near postal facilities and that are already suffering from significantly degraded air quality.  *See Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330-31 (D.C. Cir. 2021).

108.  The Final EIS is silent about the potential impacts from the development of a new production facility in Spartanburg, South Carolina, that Oshkosh has announced would be built to meet the demands of its contract.  The development of this facility and production of these vehicles are part of the action the Postal Service is undertaking and will clearly cause environmental impacts.  42 U.S.C. § 4332(2)(C).  These impacts from the new facility are "reasonably foreseeable and have a reasonably close causal relationship to the proposed action," and the Postal Service must consider them.  *See* 40 C.F.R. § 1508.1(g) (defining "effects" or "impacts" of a proposed action or alternatives).

25

109.   The Final EIS also significantly underestimates the climate impacts of maintaining a massive fleet of gas-powered vehicles for potentially the next several decades, rather than electrifying its fleet in the near term.   Moreover, the conclusion that "[n]o effects of climate change are expected" is inconsistent with even the estimates in the Final EIS and is contrary to Ninth Circuit precedent.   *See Center for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1224 (9th Cir. 2008) (finding that "simply because the Final Rule may be an improvement over the [prior] standard does not necessarily mean that it will not have a 'significant effect' on the environment").

110.   In the Record of Decision, the Postal Service incorporated the Final EIS's findings and analysis and determined that it would implement the Preferred Alternative.

111.   Accordingly, the Postal Service's issuance of the Final EIS and Record of Decision was arbitrary and capricious, did not demonstrate reasoned decision-making, exceeded the Postal Service's statutory authority, and was contrary to the requirements of NEPA, 42 U.S.C. § 4332(2)(C), 40 C.F.R. § 1502.16(a)(1), and 39 C.F.R. § 775.11(c)(6), the Final EIS and Record of Decision should be held unlawful and set aside, and the Postal Service should be enjoined from taking action under its Next Generation Delivery Vehicle Acquisitions program until it has complied with NEPA.

**FOURTH CAUSE OF ACTION**

**(Violation of NEPA:**

**Failure to Maintain Scientific Integrity**

**42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.23)**

112.   Paragraphs 1 through 111 are realleged and incorporated herein by reference.

113.   Plaintiffs have a right of action to declare unlawful and set aside agency action that is arbitrary and capricious, exceeds the agency's statutory authority, and violates NEPA.

114.   NEPA requires that federal agencies "shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents," "shall make use of reliable existing data and resources," and "shall identify any methodologies used and

1  shall make explicit reference to the scientific and other sources relied upon for conclusions in the

2  statement." 40 C.F.R. § 1502.23.

3      115.  The Final EIS fails to ensure the scientific integrity of its analysis by relying upon

4  unsupported assumptions and undisclosed methodologies to justify its Preferred Alternative.

5  Many of the Final EIS's statements do not reflect electric vehicle technology available today or

6  developments in this rapidly expanding industry, but instead incorrectly assume that conditions

7  today will continue decades into the future.

8      116.  For example, the Final EIS claims that, if used on "routes that exceed 70 miles,"

9  electric vehicles "might not have sufficient power to complete the route, especially as the battery

10  ages and has less capacity," despite the current availability of electric vehicles that far exceed

11  such mileage on a single charge and rapid advances in battery technology.  Moreover, such routes

12  constitute just five percent of the Postal Service's total delivery routes.  The Final EIS also fails to

13  account for declining electric vehicle costs and proliferating charging infrastructure, while grossly

14  underestimating costs for gasoline and assuming that such fuel costs will remain largely constant

15  several years into the future.  The Final EIS further ignores that many other private delivery fleets

16  are rapidly adopting electric vehicle fleets that are well suited to meet similar needs.  And, in

17  many areas of the Final EIS, such as the economic analysis that estimates a "total cost of

18  ownership" for different vehicles, the document does not provide the underlying data or sources

19  of information necessary to evaluate or replicate the results.

20      117.  Taken as a whole, the Final EIS presents information regarding environmental

21  impacts and costs that is incomplete and biased in favor of its Preferred Alternative, at the

22  expense of providing the public and decision makers with accurate information to allow for a

23  meaningful consideration of the Proposed Action and alternatives.

24      118.  In the Record of Decision, the Postal Service incorporated the Final EIS's findings

25  and analysis and determined that it would implement the Preferred Alternative.

26      119.  Accordingly, the Postal Service's issuance of the Final EIS and Record of Decision

27  was arbitrary and capricious, did not demonstrate reasoned decision-making, exceeded the Postal

28  Service's statutory authority, and was contrary to the requirements of NEPA, 42 U.S.C. §

page

4332(2)(C) and 40 C.F.R. § 1502.23, the Final EIS and Record of Decision should be held unlawful and set aside, and the Postal Service should be enjoined from taking action under its Next Generation Delivery Vehicle Acquisitions program until it has complied with NEPA.

## FIFTH CAUSE OF ACTION

### (Violation of NEPA:

### Failure to Consider Inconsistencies with State Laws and Plans

### 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1506.2(d))

120.  Paragraphs 1 through 119 are realleged and incorporated herein by reference.

121.  Plaintiffs have a right of action to declare unlawful and set aside agency action that is arbitrary and capricious, exceeds the agency's statutory authority, and violates NEPA.

122.  "To better integrate environmental impact statements into State, Tribal, or local planning processes," NEPA provides that an EIS "shall discuss any inconsistency of a proposed action with any approved State, Tribal, or local plan or law[,] and [w]here an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law." 40 C.F.R. § 1506.2(d).

123.  Here, the Final EIS fails to discuss the inconsistency of the Preferred Alternative with numerous State and local laws and plans to reduce greenhouse gas emissions and fossil fuel consumption to mitigate the devastating consequences of global climate change, as well as to electrify the transportation sector.

124.  In the Record of Decision, the Postal Service incorporated the Final EIS's findings and analysis and determined that it would implement the Preferred Alternative.

125.  Accordingly, the Postal Service's issuance of the Final EIS and Record of Decision was arbitrary and capricious, did not demonstrate reasoned decision-making, exceeded the Postal Service's statutory authority, and was contrary to the requirements of NEPA, 42 U.S.C. § 4332(2)(C) and 40 C.F.R. § 1506.2(d), the Final EIS and Record of Decision should be held unlawful and set aside, and the Postal Service should be enjoined from taking action under its Next Generation Delivery Vehicle Acquisitions program until it has complied with NEPA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1.      Issue a declaratory judgment that the Postal Service violated NEPA in issuing the Final EIS and Record of Decision;

2.      Issue an order vacating and setting aside the Final EIS and Record of Decision unless and until the Postal Service complies with applicable law;

3.      Issue an order enjoining action by the Postal Service under its Next Generation Vehicle Acquisition Program until it has complied with NEPA;

4.      Award Plaintiffs their costs, expenses, and reasonable attorneys' fees; and

5.      Award such other relief as the Court deems just and proper.

First Amended Complaint for Declaratory and Injunctive Relief – Case No. 3:22-cv-02583-JD

| | |
|---|---|
| 1 | Dated:  June 10, 2022 |
| 2 | |

Respectfully submitted,

ROB BONTA
Attorney General of California
DAVID A. ZONANA
Supervising Deputy Attorney General

/s/ George Torgun
GEORGE TORGUN, State Bar No. 222085
Deputy Attorneys General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA  94612-0550
Telephone:  (510) 879-1002
Email:  George.Torgun@doj.ca.gov

*Attorneys for Plaintiff State of California*

LETITIA JAMES
Attorney General of New York

/s/ Claiborne E. Walthall
CLAIBORNE E. WALTHALL (*pro hac vice*)
Assistant Attorney General
New York State Office of the Attorney General
Environmental Protection Bureau
State Capitol
Albany, NY 12224
(518) 776-2380
claiborne.walthall@ag.ny.gov

*Attorneys for Plaintiff State of New York*

JOSH SHAPIRO
Attorney General of Pennsylvania

/s/ Aimee D. Thomson
AIMEE D. THOMSON (*pro hac vice*)
Deputy Attorney General
ANN R. JOHNSTON
Senior Deputy Attorney General
Office of Attorney General
1600 Arch Street, Suite 300
Philadelphia, PA 19103
Telephone:  (267) 940-6696
Email:  athomson@attorneygeneral.gov

*Attorneys for Plaintiff
Commonwealth of Pennsylvania*

KATHLEEN JENNINGS
Attorney General of Delaware

/s/ Vanessa L. Kassab
CHRISTIAN DOUGLAS WRIGHT
Director of Impact Litigation
VANESSA L. KASSAB (*pro hac vice*)
JAMESON A. L. TWEEDIE
RALPH K. DURSTEIN, III
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899

*Attorneys for Plaintiff State of Delaware*

WILLIAM TONG
Attorney General of Connecticut

/s/ William E. Dornbos
WILLIAM E. DORNBOS (*pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone:  (860) 808-5250
Email:  William.Dornbos@ct.gov

*Attorneys for Plaintiff State of Connecticut*

KWAME RAOUL
Attorney General of Illinois

/s/ Jason E. James
JASON E. JAMES (*pro hac vice*)
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental
Enforcement/Asbestos Litigation Division
Office of the Attorney General
69 W. Washington St., 18th Floor
Chicago, IL 60602
Tel: (312) 814-0660
Email: Jason.james@ilag.gov

*Attorneys for Plaintiff State of Illinois*

First Amended Complaint for Declaratory and Injunctive Relief – Case No. 3:22-cv-02583-JD

1

2 AARON M. FREY
Attorney General of Maine

3 /s/ Jason Anton
JASON ANTON

4 PAUL SUITTER
JILLIAN R. O'BRIEN, State Bar No. 251311

5 Assistant Attorneys General
Six State House Station

6 Augusta, Maine 04333-0006
Telephone:  (207) 626-8800

7 Fax: (207) 287-3145
Email: Jason.Anton@maine.gov

8 Email:  Paul.Suitter@maine.gov

9 *Attorneys for Plaintiff State of Maine*

10

11 BRIAN E. FROSH
Attorney General of Maryland

12 /s/ Steven J. Goldstein
STEVEN J. GOLDSTEIN (*pro hac vice*)

13 Special Assistant Attorney General
Office of the Attorney General

14 200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202

15 Telephone:  (410) 576-6414
Email:  sgoldstein@oag.state.md.us

16

17 *Attorneys for Plaintiff State of Maryland*

18 FOR THE PEOPLE OF THE
STATE OF MICHIGAN

19 /s/ Elizabeth Morrisseau

20 ELIZABETH MORRISSEAU (*pro hac vice*)
Assistant Attorney General

21 Environment, Natural Resources,
and Agriculture Division

22 Michigan Attorney General's Office
6th Floor, G. Mennen Williams Building

23 525 West Ottawa Street
PO Box 30755

24 Lansing, MI 48933
Telephone:  (517) 335-7664

25 Email:  MorrisseauE@michigan.gov

26 *Attorneys for Plaintiff the People of the State of Michigan*

27

28

MATTHEW J. PLATKIN
Acting Attorney General of New Jersey

/s/ Lisa Morelli
LISA MORELLI, State Bar No. 137092
Deputy Attorney General
Division of Law
25 Market Street
P.O. Box 093
Trenton, NJ 08625-093
Telephone: 609-376-2745
Email: lisa.morelli@law.njoag.gov

*Attorneys for Plaintiff State of New Jersey*

HECTOR BALDERAS
Attorney General of New Mexico

/s/ William Grantham
WILLIAM GRANTHAM (*pro hac vice*)
Assistant Attorney General
201 Third St. NW, Suite 300
Albuquerque, NM 87102
Telephone: (505) 717-3520
E-Mail: wgrantham@nmag.gov

*Attorneys for Plaintiff State of New Mexico*

JOSHUA H. STEIN
Attorney General of North Carolina

/s/ Francisco Benzoni
ASHER SPILLER
Assistant Attorney General
FRANCISCO BENZONI*
Special Deputy Attorney General
114. W. Edenton Street
Raleigh, NC 27063
Telephone:  (919)716-7600
Email: fbenzoni@ncdoj.gov
aspiller@ncdoj.gov

*Attorneys for Plaintiff State of North Carolina*

ELLEN F. ROSENBLUM
Attorney General of Oregon

/s/ Paul Garrahan
PAUL GARRAHAN (*pro hac vice*)
Attorney-in-Charge
STEVE NOVICK (*pro hac vice*)
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Telephone:  (503) 947-4593
Email: Steve.Novick@doj.state.or.us

*Attorneys for Plaintiff State of Oregon*

PETER F. NERONHA
Attorney General of Rhode Island

/s/ Nicholas M. Vaz
NICHOLAS M. VAZ (*pro hac vice*)
Special Assistant Attorney General
Office of the Attorney General
Environmental and Energy Unit
150 South Main Street
Providence, Rhode Island 02903
Telephone: (401) 274-4400 ext. 2297
nvaz@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*

THOMAS J. DONOVAN, JR.
Attorney General of Vermont

/s/ Nicholas F. Persampieri
NICHOLAS F. PERSAMPIERI (*pro hac vice*)
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3171
nick.persampieri@vermont.gov

*Attorneys for Plaintiff State of Vermont*

ROBERT W. FERGUSON
Attorney General of Washington

/s/ Megan Sallomi
MEGAN SALLOMI, State Bar. No. 300580
Assistant Attorney General
Environmental Protection Division
Washington State Attorney General's
Office
800 5th Ave Suite 2000,
Seattle, WA 98104-3188
Telephone:  (206) 389-2437
Email:  Megan.Sallomi@atg.ca.gov

*Attorneys for Plaintiff State of Washington*

KARL A. RACINE
Attorney General for the District of Columbia

/s/ Adam Teitelbaum
ADAM TEITELBAUM, State Bar. No. 310565
Deputy Director
Office of the Attorney General
District of Columbia
400 6th St. NW
Washington, DC 20001
Telephone: 202-256-3713
Email:  Adam.Teitelbaum@dc.gov

*Attorneys for Plaintiff District of Columbia*

HON. SYLVIA O. HINDS-RADIX
Corporation Counsel
of the City of New York

/s/ Alice R. Baker
ALICE R. BAKER (*pro hac vice*)
AARON M. BLOOM
JOSEPH PEPE
Senior Counsels
New York City Law Department
100 Church Street
New York, NY 10007
Telephone:  (212) 356-2314
E-mail: albaker@law.nyc.gov

*Attorneys for Plaintiff City of New York*

32

1

2    ADAN A. SCHWARTZ
     Acting District Counsel

3    /s/ Marcia L. Raymond
     MARCIA L. RAYMOND, State Bar No. 215655
4    Assistant Counsel
     Bay Area Air Quality Management District
5    350 Beale Street, Suite 600
     San Francisco, CA 94105
6    (415) 749-5158
     mraymond@baaqmd.gov
7
     *Attorneys for Plaintiff Bay Area Air Quality*
8    *Management District*

9
     PHIL WEISER
10   Attorney General of Colorado

11   /s/ Eric R. Olson
     ERIC R. OLSON*
12   Solicitor General
     Office of the Attorney General
13   Colorado Department of Law
     1300 Broadway, 10th Floor
14   Denver, CO 80203
     (720) 508 6548
15   Eric.Olson@coag.gov

16   *Attorneys for Plaintiff State of Colorado*

17   *Application for admission pro hac vice
     forthcoming*
18

19

20

21

22

23

24

25

26

27

28

First Amended Complaint for Declaratory and Injunctive Relief – Case No. 3:22-cv-02583-JD