1  Timothy S. Bishop (*pro hac vice*)
   Avi M. Kupfer (*pro hac vice*)
2  MAYER BROWN LLP
   71 South Wacker Drive
3  Chicago, IL 60606
   (312) 701-7829
4  tbishop@mayerbrown.com
   akupfer@mayerbrown.com
5
   Christopher Mitchell Hendy (SBN 282036)
6  MAYER BROWN LLP
   350 South Grand Avenue
7  Los Angeles, CA 90072
   (213) 229-9500
8  mhendy@mayerbrown.com

9  *Attorneys for Defendants*
   *Louis DeJoy and U.S. Postal Service*
10
   [Additional counsel listed on signature page]
11
                    UNITED STATES DISTRICT COURT
12                 NORTHERN DISTRICT OF CALIFORNIA
13
   CLEANAIRNOW, et al.,                   Case Nos. 3:22-cv-2576-RFL
14                                                   3:22-cv-2583-RFL
                    Plaintiffs,
15                                          **DEFENDANTS' FINAL OPPOSITION**
         v.                                **TO PLAINTIFFS' MOTION FOR**
16                                         **SUMMARY JUDGMENT AND CROSS-**
   LOUIS DEJOY, et al.,                    **MOTION FOR SUMMARY**
17                                         **JUDGMENT**
                    Defendants,
18                                         Date: December 17, 2024
   OSHKOSH DEFENSE, LLC,                   Time: 10:00 a.m.
19                                         Judge: Hon. Rita F. Lin
                    Intervenor-Defendant.  Location: Courtroom 15, 18th Floor
20
   STATE OF CALIFORNIA, et al.,
21
                    Plaintiffs,
22
         v.
23
   UNITED STATES POSTAL SERVICE, et al.,
24
                    Defendants,
25
   OSHKOSH DEFENSE, LLC,
26
                    Intervenor-Defendant.
27

28

1

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3

PLEASE TAKE NOTICE that on December 17, 2024 at 10:00 a.m., or as soon thereafter

4

as the Court's calendar permits, before the Honorable Rita F. Lin, Defendants the United States

5

Postal Service and Louis DeJoy will and do move for summary judgment on all of plaintiffs' claims.

6

This motion is based on this Notice, the Memorandum of Points and Authorities below, all materials

7

in the record, any oral argument, and any other information on which the Court may properly rely.

8

Defendants seek an order denying plaintiffs' motion for summary judgment and granting

9

defendants' motion for summary judgment on all claims.

10

**STATEMENT OF THE ISSUES**

11

1.      Whether plaintiffs have demonstrated a concrete and imminent injury-in-fact from

12

vehicle emissions sufficient for Article III standing to challenge a federal program that will imme-

13

diately reduce their harm from such emissions.

14

2.      Whether government plaintiffs have demonstrated that their alleged climate-change-

15

based economic and proprietary harms are fairly traceable to emissions from 40,250 U.S. Postal

16

Service vehicles sufficient for Article III standing.

17

3.      Whether plaintiffs may challenge the U.S. Postal Service's discretionary operational

18

and business decisions regarding the composition of the national mail-delivery fleet under the Ad-

19

ministrative Procedure Act, 5 U.S.C. § 702, despite the Postal Reorganization Act, 39 U.S.C.

20

§ 410(a), exempting those decisions from judicial review.

21

4.      Whether the U.S. Postal Service's environmental review of its Next Generation De-

22

livery Vehicle Acquisitions program complied with the National Environmental Policy Act, 42

23

U.S.C. § 4321 *et seq.*

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

STATEMENT OF THE CASE ......................................................................................... 3

    A.    Factual Background ...................................................................................... 3

        1.    The Postal Service Operates Like A Business To Promptly
                And Efficiently Deliver The Mail Six Days A Week To
                165 Million Addresses ....................................................................... 3

        2.    There Is An Urgent Need To Update The Aging Postal
                Delivery Fleet .................................................................................... 4

        3.    The Postal Service Is Replacing Half Its Delivery Fleet
                And Most Of The New Vehicles Will Be Electric ............................. 4

            i.    The Postal Service evaluated dozens of prototypes
                    and selected an NGDV supplier ........................................... 5

            ii.    The Postal Service prepared an EIS to analyze
                    potential environmental impacts and alternatives ................ 6

            iii.    Changing operational needs and increased funding
                   led the Postal Service to modify the program ...................... 8

            iv.    The Postal Service prepared an SEIS to analyze the
                  environmental impacts of program modifications ............... 9

    B.    Procedural History .................................................................................... 11

ARGUMENT .................................................................................................................. 11

I.    PLAINTIFFS LACK STANDING TO BRING THEIR CLAIMS ................. 11

    A.    Plaintiffs Have Not Established A Cognizable Injury-In-Fact .................. 12

        1.    Plaintiffs Have Not Shown That The Program Will
                Harm Them ...................................................................................... 12

        2.    Plaintiffs Have Not Shown Any Imminent Injury .......................... 14

            i.    The organization plaintiffs have not identified any
                    member who faces an imminent injury ................................. 14

            ii.    The government plaintiffs have not shown any
                    impending harm to their proprietary interests ..................... 15

    B.    The Government Plaintiffs Have Not Established That The
         Program Will Cause Their Alleged Injuries ............................................. 16

II.    PLAINTIFFS' CLAIMS FAIL ON THE MERITS ....................................... 18

    A.    Plaintiffs Cannot Challenge The Composition Of The National
        Postal Fleet And The Postal Service's Decision Was Reasonable
        In Any Event ............................................................................................ 19

# TABLE OF CONTENTS
(continued)

|  |  |  | Page |
|---|---|---|---|
| | 1. | Plaintiffs' Challenge To The Electric-Gas Vehicle Mix Fails | 19 |
| | 2. | Plaintiffs' Challenge To The Consideration Of Upfront Costs Fails | 22 |
| B. | | The Postal Service Complied With NEPA's Process Requirements | 23 |
| | 1. | The NEPA Review Was Not Predetermined | 23 |
| | | i. The vehicle supplier contracts were expressly contingent on later NEPA analysis | 23 |
| | | ii. Plaintiffs' predetermination arguments lack merit | 25 |
| | | iii. Any error was harmless | 28 |
| | 2. | The Postal Service Considered A Reasonable Range Of Alternatives | 29 |
| | | i. The Postal Service analyzed seven alternatives in detail | 29 |
| | | ii. NEPA does not require agencies to analyze commenters' preferred alternatives | 33 |
| | | iii. Any error was harmless | 34 |
| | 3. | The Emissions Modeling Was Reasonable | 34 |
| | 4. | The Analysis Of Environmental-Justice Impacts Was Reasonable | 35 |
| | 5. | The Program Is Consistent With The Government Plaintiffs' Laws | 37 |
| III. | | VACATUR AND AN INJUNCTION ARE UNWARRANTED | 38 |
| CONCLUSION | | | 40 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akiak Native Cmty. v. USPS,*
    213 F.3d 1140 (9th Cir. 2000)....................................................................... 4, 19, 23

*Amigos Bravos v. BLM,*
    816 F. Supp. 2d 1118 (D.N.M. 2011) .................................................................... 18

*Ashley Creek Phosphate Co. v. Norton,*
    420 F.3d 934 (9th Cir. 2005)..................................................................................... 12

*Ass'n of Pub. Agency Customers, Inc. v. BPA,*
    126 F.3d 1158 (9th Cir. 1997)................................................................................... 22

*Audubon Soc'y of Portland v. Haaland,*
    40 F.4th 967 (9th Cir. 2022)...................................................................................... 29

*Baltimore Gas & Elec. Co. v. NRDC,*
    462 U.S. 87 (1983)..................................................................................................... 23

*Beck v. McDonald,*
    848 F.3d 262 (4th Cir. 2017)..................................................................................... 15

*Beverly Hills Unified Sch. Dist. v. FTA,*
    2016 WL 4650428 (C.D. Cal. Feb. 1, 2016)........................................................... 27

*Biden v. Texas,*
    597 U.S. 785 (2022) ..................................................................................... 21, 26, 31

*Blue Mountains Biodiversity Project v. Jeffries,*
    99 F.4th 438 (9th Cir. 2024)...................................................................................... 28

*Cal. Cmtys. Against Toxics v. EPA,*
    688 F.3d 989 (9th Cir. 2012)..................................................................................... 39

*California v. Texas,*
    593 U.S. 659 (2021) .................................................................................................. 40

*Citizens for Better Forestry v. USDA,*
    341 F.3d 961 (9th Cir. 2003)............................................................................... 14, 15

*City and Cnty. of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018)................................................................................... 40

*City of Carmel-By-The-Sea v. DOT,*
    123 F.3d 1142 (9th Cir. 1997)................................................................................... 33

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*City of Los Angeles v. FAA*,
  63 F.4th 835 (9th Cir. 2023)..................................................... 24, 26, 27, 28

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................ 12, 14, 15, 16

*Conner v. Burford*,
  848 F.2d 1441 (9th Cir. 1988)............................................................ 26

*Ctr. for Biological Diversity v. BLM*,
  833 F.3d 1136 (9th Cir. 2016)............................................................ 19

*Ctr. for Env't L. & Pol'y v. USBR*,
  655 F.3d 1000 (9th Cir. 2011)............................................................ 24

*Ctr. for Food Safety v. Regan*,
  56 F.4th 648 (9th Cir. 2022)............................................................ 38

*Currier v. Potter*,
  379 F.3d 716 (9th Cir. 2004)............................................................ 3, 22

*DOE v. Brown*,
  600 U.S. 551 (2023) ............................................................ 13

*E. Bay Sanctuary Covenant v. Barr*,
  934 F.3d 1026 (9th Cir. 2019)............................................................ 40

*Earth Island Inst. v. USFS*,
  87 F.4th 1054 (9th Cir. 2023)............................................................ 30, 33

*Env't Prot. Info. Ctr. v. Blackwell*,
  389 F. Supp. 2d 1174 (N.D. Cal. 2004) ............................................................ 33

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ............................................................ 11, 16, 17

*Forelaws on Bd. v. Johnson*,
  743 F.2d 677 (9th Cir. 1984)............................................................ 39

*Forest Guardians v. FWS*,
  611 F.3d 692 (10th Cir. 2010)............................................................ 24, 27, 28

*Franchise Tax Bd. of Cal. v. USPS*,
  467 U.S. 512 (1984) ............................................................ 3

*Friends of Animals v. Romero*,
  948 F.3d 579 (2d Cir. 2020)............................................................ 30

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Friends of Southeast's Future v. Morrison,*
    153 F.3d 1059 (9th Cir. 1998)................................................................................................ 29

*Gladstone Realtors v. Vill. of Bellwood,*
    441 U.S. 91 (1979)................................................................................................................. 12

*Haaland v. Brackeen,*
    599 U.S. 255 (2023)............................................................................................................... 15

*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci,*
    857 F.2d 505 (9th Cir. 1988)................................................................................................. 28

*Idaho Farm Bureau Fed'n v. Babbitt,*
    900 F. Supp. 1349 (D. Idaho 1995)....................................................................................... 14

*Idaho Wool Growers Ass'n v. Vilsack,*
    816 F.3d 1095 (9th Cir. 2016)........................................................................................ 29, 34

*Japanese Vill., LLC v. FTA,*
    843 F.3d 445 (9th Cir. 2016)................................................................................................. 30

*Juliana v. United States,*
    947 F.3d 1159 (9th Cir. 2020)............................................................................................... 18

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004)............................................................................................................... 15

*Latham v. Volpe,*
    455 F.2d 1111 (9th Cir. 1971)............................................................................................... 26

*Latin Americans for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.,*
    756 F.3d 447 (6th Cir. 2014)................................................................................................. 33

*Lee v. U.S. Air Force,*
    354 F.3d 1229 (10th Cir. 2004)............................................................................................. 24

*Lotus Vaping Techs., LLC v. FDA,*
    73 F.4th 657 (9th Cir. 2023).................................................................................................. 29

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)......................................................................................................... 12, 14

*Mail Ord. Ass'n of Am. v. USPS,*
    986 F.2d 509 (D.C. Cir. 1993) ................................................................................................ 3

*Marsh v. Or. Natural Res. Council,*
    490 U.S. 360 (1989)........................................................................................................... 6, 32

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ......................................................................................... 16, 18

4

*McMorris v. Carlos Lopez & Assocs.*,
   995 F.3d 295 (2d Cir. 2021) ................................................................................. 15

5

6

*Metcalf v. Daley*,
   214 F.3d 1135 (9th Cir. 2000) .............................................................................. 26

7

8

*Michigan v. EPA*,
   581 F.3d 524 (7th Cir. 2009) ............................................................................... 14

9

*Mittleman v. PRC*,
   757 F.3d 300 (D.C. Cir. 2014) ......................................................................... 3-4, 22

10

11

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ................................................................................... 6, 25, 39

12

13

*Mont. Env't Info. Ctr. v. Stone-Manning*,
   766 F.3d 1184 (9th Cir. 2014) .............................................................................. 15

14

*Mont. Wilderness Ass'n v. Connell*,
   725 F.3d 988 (9th Cir. 2013) ........................................................................... 30, 34

15

16

*Morongo Band of Mission Indians v. FAA*,
   161 F.3d 569 (9th Cir. 1998) ............................................................................... 36

17

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*,
   463 U.S. 29 (1983) .......................................................................................... 19, 20

18

19

*N. Alaska Env't Ctr. v. Kempthorne*,
   457 F.3d 969 (9th Cir. 2006) ............................................................................... 30

20

21

*N. Cheyenne Tribe v. Norton*,
   503 F.3d 836 (9th Cir. 2007) ............................................................................... 40

22

23

*Nat'l Audubon Soc'y v. Dep't of Navy*,
   422 F.3d 174 (4th Cir. 2005) ............................................................................... 24

24

*Nat'l Mining Ass'n v. Zinke*,
   877 F.3d 845 (9th Cir. 2017) ............................................................................... 37

25

26

*Nevada v. DOE*,
   457 F.3d 78 (D.C. Cir. 2006) ............................................................................... 28

27

*Nken v. Holder*,
   556 U.S. 418 (2009) ........................................................................................... 39

28

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Nuclear Information & Resource Service v. NRC,*
457 F.3d 941 (9th Cir. 2006) ........................................................................ 13, 14

*Nw. Ecosystem All. v. FWS,*
475 F.3d 1136 (9th Cir. 2007) ................................................................................ 19

*Oceana, Inc. v. Ross,*
275 F. Supp. 3d 270 (D.D.C. 2017) ........................................................................ 19

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank,*
693 F.3d 1084 (9th Cir. 2012) ................................................................................ 30

*Protect Our Cmtys. Found. v. LaCounte,*
939 F.3d 1029 (9th Cir. 2019) ................................................................................ 30

*Pub. Citizen v. DOT,*
316 F.3d 1002 (9th Cir. 2003) ........................................................................ 17, 23

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA,*
415 F.3d 1078 (9th Cir. 2005) ........................................................................ 19, 20

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989) .................................................................................................. 6

*Save the Yaak Comm. v. Block,*
840 F.2d 714 (9th Cir. 1988) ........................................................................... 26-27

*Shinseki v. Sanders,*
556 U.S. 396 (2009) ................................................................................................ 29

*Sierra Club v. FERC,*
867 F.3d 1357 (D.C. Cir. 2017) ............................................................................. 36

*Solar Energy Indus. Ass'n v. FERC,*
80 F.4th 956 (9th Cir. 2023) .................................................................................. 38

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016) ................................................................................................ 12

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
600 U.S. 181 (2023) ................................................................................................ 14

*Sturgeon v. Masica,*
768 F.3d 1066 (9th Cir. 2014) ............................................................................... 13

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Sumanti v. Strange*,
2017 WL 6492679 (W.D. Wash. Dec. 19, 2017) ................................................................. 15

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ...................................................................... 12, 13, 14, 15

*Tenn. Env't Council v. TVA*,
32 F. Supp. 3d 876 (E.D. Tenn. 2014) ............................................................. 24

*Thomas v. Peterson*,
753 F.2d 754 (9th Cir. 1985) .......................................................................... 27

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ....................................................................................... 11

*Trenton Threatened Skies, Inc v. FAA*,
90 F.4th 122 (3d Cir. 2024) ............................................................................ 36

*Union Neighbors United, Inc. v. Jewell*,
831 F.3d 564 (D.C. Cir. 2016) ........................................................................ 31

*USPS v. Council of Greenburgh Civic Ass'ns*,
453 U.S. 114 (1981) .......................................................................................... 3

*USPS v. Flamingo Indus. (USA) Ltd.*,
540 U.S. 736 (2004) .......................................................................................... 3

*Vt. Yankee Nuclear Power Corp. v. NRDC*,
435 U.S. 519 (1978) ............................................................................. 6, 29, 33

*W. Watersheds Project v. Grimm*,
921 F.3d 1141 (9th Cir. 2019) .................................................................... 12-13

*Washington Environmental Council v. Bellon*,
732 F.3d 1131 (9th Cir. 2013) .................................................................. 17, 18

*Westlands Water Dist. v. DOT*,
376 F.3d 853 (9th Cir. 2004) ..................................................................... 30, 34

*WildWest Inst. v. Bull*,
547 F.3d 1162 (9th Cir. 2008) ............................................................. 24, 25, 27

*Winter v. NRDC*,
555 U.S. 7 (2008) .......................................................................................... 39

*Wyoming v. USDA*,
661 F.3d 1209 (10th Cir. 2011) ...................................................................... 30

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3

**Statutes**

4

5 U.S.C.

5 § 702 ........................................................................................................................... 19
§ 706 ........................................................................................................................... 28
6 § 706(2)(A) ................................................................................................................. 19

7

39 U.S.C.

8 § 101(a)-(b) ....................................................................................................... 3, 20, 40
§ 101(f) .................................................................................... 3, 19, 20, 22, 40
9 § 201 ............................................................................................................................. 3
§ 202 ............................................................................................................................. 3
10 § 202(a) ........................................................................................................................ 3
§ 401(3) ........................................................................................................................ 3
11 § 401(5) ................................................................................................................... 3, 23
§ 403 ............................................................................................................................. 3
12 § 410(a) ............................................................................................................... 3, 4, 19
13

14

42 U.S.C.

15 § 4332(2)(C) ........................................................................................................... 6, 19
§ 4332(2)(C)(i) ..................................................................................................... 22, 23
16 § 4332(2)(C)(iii) ......................................................................................................... 29

17

Cal. Health & Safety Code

18 § 38566 ....................................................................................................................... 37
§ 38550 ....................................................................................................................... 37
19

20

Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat. 1818 ........................................ 8

21

**Regulations**

22

39 C.F.R.

23 § 775.1 ........................................................................................................................ 30
§ 775.11(c)(5) ............................................................................................................. 30
24 § 775.11(f)(1)(i) ........................................................................................................... 9

25

40 C.F.R.

26
§ 1500.1(a) (2024) ........................................................................................................ 9
27 § 1500.3(d) (2023) ...................................................................................................... 29
§ 1502.2(a) (2023) ...................................................................................................... 29
28 § 1502.2(f) (2023) ....................................................................................................... 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

§ 1502.9(d) (2023) ............................................................................................................ 9
§ 1502.9(d)(1) (2023) ...................................................................................................... 32
§ 1502.9(d)(1)(i) (2023) .................................................................................................. 32
§ 1502.14(a) (2024) ................................................................................................... 29-30
§ 1502.14(a) (2023) ........................................................................................................ 29
§ 1502.14(a) (1998) ........................................................................................................ 29
§ 1503.4(a)(1) (2023) ..................................................................................................... 33
§ 1506.1(a) (2023) ................................................................................................... 6, 25
§ 1506.1(a)(2) (2023) ..................................................................................................... 24
§ 1506.2(d) (2023) .......................................................................................................... 37
§ 1508.1(z) (2023) ................................................................................................. 29, 33-34

**Other Authorities**

59 Fed. Reg. 7629 (Feb. 16, 1994) ............................................................................ 35, 36

85 Fed. Reg. 43304 (July 16, 2020) ................................................................................ 29

88 Fed. Reg. 25251 (Apr. 21, 2023) .......................................................................... 35, 36

89 Fed. Reg. 35442 (May 1, 2024) ........................................................................ 9, 30, 33

*Biden-Harris Administration Announces Historic Investment to Electrify U.S. Postal
    Service Fleet* (Dec. 20, 2022), https://perma.cc/7NKR-XFL7 ...................................... 5

Office of Fed. Chief Sustainability Officer, Council on Env't Quality, *Presidential
    Federal Sustainability Awards*, https://perma.cc/9ALH-6JRT ................................. 1, 13

U.S. Env't Protection Agency, *Population and Activity of Onroad Vehicles in
    MOVES3* 19 (Apr. 2021), https://perma.cc/LRZ4-JF5Y .................................... 34-35

U.S. Postal Serv., *Supplying Principles and Practices* (Apr. 1, 2023),
    https://about.usps.com/manuals/spp/html/welcome.htm ........................................... 23

*U.S. Postal Service Unveils First Postal Electric Vehicle Charging Stations and
    Electric Delivery Vehicles* (Jan. 22, 2024), https://perma.cc/2GJP-K5NJ .............................. 1

White House, *Fact Sheet: Biden-Harris Administration Announces New Actions to
    Reduce Greenhouse Gas Emissions and Combat the Climate Crisis* (Sept. 21,
    2023), https://perma.cc/AVA3-NNEM .................................................................... 10

# INTRODUCTION

The U.S. Postal Service is undertaking a multi-billion-dollar program to replace half its delivery fleet—106,480 increasingly unreliable vehicles from the 1980s and early 1990s that require constant upkeep. Those vehicles are expensive to maintain and lack basic safety features like airbags, anti-lock brakes, back-up cameras, and seatbelt reminders. They also lack modern operational features that are necessary for the Postal Service to promptly and reliably deliver mail to 165 million addresses six days a week, as mandated by statute. And the old vehicles emit far more pollution than new gas vehicles.

The Postal Service is committed to electrifying its fleet. Accordingly, its vehicle-replacement program mostly consists of 66,230 electric vehicles and charging stations. But given the increasingly urgent need for new vehicles, the Postal Service is purchasing some gas vehicles, which are more widely available and have lower upfront costs than electric vehicles. The program received a Presidential Federal Sustainability Award[1] and the top White House environmental official lauded the Postal Service for "leading by example by building the world's largest electric delivery vehicle fleet and delivering on President Biden's Investing in America agenda."[2]

Plaintiffs seek an extraordinary vacatur of the program and a nationwide injunction of the parts that they do not like. That would prevent the Postal Service from continuing to replace old vehicles and deploying the new electric and gas vehicles it has already received. Plaintiffs do not carry their heavy burden of showing they are entitled to such relief. To begin with, plaintiffs lack standing because they have not established any injury-in-fact. Their alleged injuries relate to emissions from new gas vehicles. But most of the new vehicles will be electric, and the new gas vehicles pollute *far less* than the old vehicles they are replacing on a one-for-one basis. Plaintiffs also do not show any imminent risk of injury, or any meaningful contribution to emissions, from new vehicles.

Further, Plaintiffs' arguments are meritless. The Postal Service is statutorily required to prioritize cost, consistency, and efficiency when purchasing vehicles. To facilitate those goals, Congress insulated Postal Service procurement decisions from judicial review. Plaintiffs cannot

---

[1] Office of Fed. Chief Sustainability Officer, Council on Env't Quality, *Presidential Federal Sustainability Awards*, https://perma.cc/9ALH-6JRT.
[2] U.S. Postal Serv., *U.S. Postal Service Unveils First Postal Electric Vehicle Charging Stations and Electric Delivery Vehicles* (Jan. 22, 2024), https://perma.cc/2GJP-K5NJ.

bring Administrative Procedure Act (APA) claims alleging that the Postal Service's vehicle purchasing decision, selected vehicle mix, and related cost analysis were arbitrary and capricious. Those arguments—which are unrelated to the process requirements in the National Environmental Policy Act (NEPA)—are not justiciable. Besides, the Postal Service's choices regarding the makeup of its fleet were reasonably based on its national operating needs.

Plaintiffs further allege that the Postal Service violated NEPA, which obligates agencies to assess the environmental impacts of their actions. Those claims are also meritless. The Postal Service conducted two extensive rounds of environmental review. Its vehicle supplier contracts did not predetermine the outcome of that analysis. The Postal Service entered into contracts to secure supplier commitments but those contracts were expressly contingent on independent NEPA review. That is standard agency practice for complex programs that require years to develop. Plaintiffs seize on the contracts' payment guarantees for work performed. But that did not predetermine the outcome—the Postal Service always had the option to change course and it completed the NEPA review before receiving any vehicles. The Postal Service also evaluated a reasonable range of seven alternatives, including several all-electric alternatives. Plaintiffs wanted the Postal Service to analyze their preferred percentages of electric vehicles. But NEPA does not require agencies to evaluate every conceivable alternative and the Postal Service fully considered the environmental impacts of electric and gas vehicles. Plaintiffs' preferences are not actionable under NEPA.

Even if the Court were to hold that the Postal Service violated NEPA process requirements, it still should reject plaintiffs' sweeping request for vacatur and a nationwide injunction. Injunctions are typically unwarranted in NEPA cases, where the ultimate legal claim is that the agency must conduct more environmental review, not that it must cease the underlying action. Further, courts must seriously weigh the disruptive consequences of vacatur or an injunction. Here, the consequences would be catastrophic for the Postal Service and the public. The Postal Service would be forced to continue using increasingly unreliable decades-old vehicles, preventing it from undertaking urgently needed modernization. That would needlessly create safety risks for mail carriers and the public and prolong their exposure to exhaust from higher-polluting vehicles. The Postal Service also would have to immediately stop deploying new vehicles it has already received. These

disruptions would have extraordinary health, economic, and electoral consequences by slowing the delivery of time-sensitive mail on which the public (and plaintiffs) depend. A remedy with such harmful nationwide effects is unwarranted.

**STATEMENT OF THE CASE**

### A.    Factual Background

#### 1.    The Postal Service Operates Like A Business To Promptly And Efficiently Deliver The Mail Six Days A Week To 165 Million Addresses

The Postal Service is "the nation's oldest and largest public business" (*USPS v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 739 (2004)) and its "largest nonmilitary purchaser of transport." *USPS v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 122 (1981); JA35. It has a 640,000-person workforce that processes billions of letters and packages annually. JA970. That includes 248,000 carriers who operate a fleet of more than 210,000 vehicles, driving millions of miles daily to service 165 million addresses. JA950, JA968; *see Council of Greenburgh*, 453 U.S. at 122.

In 1970, Congress enacted the Postal Reorganization Act (PRA), 39 U.S.C. § 101 *et seq.*, converting the Postal Service into an independent agency to "increase . . . efficiency . . . and reduce political influences on its operations." *Flamingo Indus.*, 540 U.S. at 740. The PRA requires the Postal Service to deliver the mail at least six days a week in a "prompt, reliable, and efficient" manner. 39 U.S.C. §§ 101(a)-(b), 201, 403. In carrying out that mission, the Postal Service must run "like a business." *Franchise Tax Bd. of Cal. v. USPS*, 467 U.S. 512, 520 (1984). To that end, the Postal Service is led by a Board of Governors "with functions similar to a board of directors." *Mail Ord. Ass'n of Am. v. USPS*, 986 F.2d 509, 519 (D.C. Cir. 1993); *see* 39 U.S.C. § 202. The Board "direct[s]" the Postal Service, including in entering into contracts, making expenditures, and acquiring property "necessary or convenient in the transaction of its business." 39 U.S.C. §§ 202(a), 401(3), (5). Crucially, the PRA mandates that the Postal Service, in selecting delivery vehicles, "give highest consideration" to "the prompt, economical, consistent, and reliable delivery of all mail in a manner that increases operational efficiency and reduces complexity." *Id.* § 101(f).

To enable the Postal Service to effectively execute those responsibilities, the PRA contains an "express removal of [APA] review of the Service's actions." *Currier v. Potter*, 379 F.3d 716, 725 (9th Cir. 2004) (discussing 39 U.S.C. § 410(a)); *see Mittleman v. PRC*, 757 F.3d 300, 304-05

- 3 -

1  (D.C. Cir. 2014). There is a narrow exception for "laws [that] remain in force as rules or regulations

2  of the Postal Service." 39 U.S.C. § 410(a). The Ninth Circuit has held that the exception encom-

3  passes NEPA. *See Akiak Native Cmty. v. USPS*, 213 F.3d 1140, 1144 (9th Cir. 2000).

4  ### 2.    There Is An Urgent Need To Update The Aging Postal Delivery Fleet

5        Due to constrained finances, the Postal Service's 210,000-vehicle fleet mostly consists of

6  purpose-built vehicles that are, on average, *32 years old*. JA941, JA950, JA966-67. Those vehicles

7  are "near or at the end of their useful li[ves]." JA941. Their main powertrain components have been

8  replaced multiple times and are currently available only through aftermarket suppliers. JA967. And

9  the only way to repair their chassis is by contracting with suppliers to "reverse engineer" the orig-

10  inal parts. *Id.* Annual maintenance costs exceed $4,500 per vehicle and are increasing. JA960-61,

11  JA967. In addition, the old vehicles are "energy-intensive [and] high-polluting" compared to mod-

12  ern gas vehicles. *Id.*; *see* JA998.

13        These old vehicles lack "modern safety . . . features needed for mail carriers," and to protect

14  other road users, including airbags, anti-lock brakes, air conditioning, back-up cameras and alarms,

15  intermittent windshield wipers, blind-spot warning systems, daytime running lights, and seatbelt

16  reminders. JA941, JA967. They also lack operational features, such as internal access to cargo

17  areas, window openings for carrier mobility, and sufficient mail trays in the cabins. *Id.*

18        The vehicles' 1980s design made sense when letters were a larger percentage of overall

19  mail. *See* JA968. But today, the Postal Service delivers more packages and services far more de-

20  livery points, and those trends are expected to continue. *Id.* For these reasons, the Postal Service

21  concluded that the old vehicles are "no longer effective in enabling" it to fulfill the "Congressional

22  mandate to maintain efficient nationwide delivery of the mail." JA941.

23  ### 3.    The Postal Service Is Replacing Half Its Delivery Fleet And Most Of The New Vehicles Will Be Electric

24        In December 2023, the Postal Service issued a Revised Record of Decision (ROD) to pur-

25  chase and deploy 106,480 new vehicles to replace 1980s and early 1990s delivery vehicles. The

26  new vehicles include purpose-built Next Generation Delivery Vehicles (NGDVs) and commercial-

27  off-the-shelf (COTS) vehicles. JA930. Sixty-two percent of the new vehicles will be electric. *Id.*

28  The Biden Administration heralded the Postal Service's "historic . . . investment" in electric

vehicles.[3] The Revised ROD was the culmination of more than seven years of agency planning and operational, engineering, and scientific analysis, including two robust NEPA reviews.

### i.    The Postal Service evaluated dozens of prototypes and selected an NGDV supplier

The vehicle-modernization process began in 2015 when the Postal Service posted a public notice seeking information from manufacturers on developing NGDV prototypes according to operational specifications. JA30. Fifteen manufacturers responded and the Postal Service invited them to submit proposals. *Id.* Based on the submissions, the Postal Service awarded contracts to six suppliers that developed 44 gas, hybrid, and electric prototypes. *Id.* The prototype contracts did not "beg[i]n the [vehicle acquisition] Program." Pls.' Br. 21 (hereinafter "Br."). They were discrete actions separate from the challenged decision to "purchase and deploy[]" 106,480 vehicles. JA930.

The Postal Service conducted 450,000 hours of prototype testing, and evaluated total cost of ownership, vehicle design, and supplier manufacturing capabilities. JA30-31, JA246, JA309-12. During that process, the Postal Service consulted with mail carriers and other federal stakeholders, the automotive industry, and postal unions. JA31. Based on that analysis, the Postal Service, in 2019, sought proposals to manufacture an NGDV with operational features including a walk-in cargo area with sufficient package space, right-hand-drive configuration for curbside delivery, and an ergonomic design, along with modern features for driver safety and comfort. *Id.*

In February 2021, the Postal Service entered into a contract with Oshkosh Defense LLC (Oshkosh) to deliver 50,000-165,000 NGDVs. JA866. Like many contracts for major agency programs, the NGDV contract was "expressly contingent upon the satisfactory completion of the NEPA . . . process." *Id.* A "special provision" provided that the Postal Service was "required to comply with" NEPA; that it "anticipate[d] preparing . . . detailed" analysis of "the environmental impacts of" the program "as well as reasonable alternatives"; and that it could not "guaranty either the outcome or duration of the NEPA . . . process," which could "require[]" changing "the quantity [or] type" of "NGDVs purchased." JA873. The contract stated that the Postal Service would compensate Oshkosh for work performed. JA900.

---

[3] *Biden-Harris Administration Announces Historic Investment to Electrify U.S. Postal Service Fleet* (Dec. 20, 2022), https://perma.cc/7NKR-XFL7.

The Postal Service recognized that NGDV production would take significant time and "prudent planning." JA11-12. The Postal Service allocated up to $482 million for Oshkosh to complete pre-production engineering and tooling necessary to make both gas and electric NGDVs. JA11-12. The allocation did not fund "the purchase of any vehicles." JA12. The Postal Service paid only a "small fraction" of the allocation prior to completing its NEPA review. JA11.

ii.     **The Postal Service prepared an EIS to analyze potential environmental impacts and alternatives**

Pursuant to NEPA, the Postal Service analyzed potential environmental effects of the program. NEPA is an "essentially procedural" statute. *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978). It requires an agency proposing a "major Federal action[] significantly affecting the quality of the human environment" to prepare an environmental impact statement (EIS). 42 U.S.C. § 4332(2)(C). NEPA does not "mandat[e] . . . particular substantive environmental results" (*Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989)) but rather ensures that agencies take a "hard look" at the potential environmental effects of their actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Importantly, agencies may take "action in furtherance of [a] proposal while the EIS is being prepared" (*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 145 (2010)) if the action does not have "adverse environmental impact[s]" or "[l]imit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a) (2023).

In March 2021, the Postal Service announced that it would prepare an EIS for the program and solicited public comments on its scope. JA33. The Postal Service incorporated the 1,750 comments it received into a draft EIS that analyzed potential impacts of the program. JA2274-441. The Postal Service solicited a second round of feedback on the draft EIS and received 37,500 comments, the vast majority of which were form letters from advocacy-group members. JA118. The Postal Service incorporated those comments into the final EIS, which it published in December 2021. JA17-383. The final EIS contained responses to comments (JA263-304) including a detailed response to comments from the Environmental Protection Agency (EPA). JA263-91; *see* JA120-32. That response provided additional information on the Postal Service's emissions analysis (JA264); explained why EPA's preferred electric-vehicle suppliers did not meet Postal Service standards (JA274-75); identified sources of price data for fuel and electricity (JA269-71); answered cost

questions (JA272-73); and addressed environmental-justice questions (JA289-90).

The EIS analyzed in detail the impacts of five—not four (*cf.* Br. 9)—alternatives: purchasing (1) 50,000-165,000 NGDVs, at least 10% of which would be electric; (2) 50,000-165,000 electric NGDVs; (3) up to 165,000 gas COTS vehicles; (4) up to 165,000 electric COTS vehicles; and (5) implementing a "no-action alternative" to "maintain[] . . . the status quo." JA38-45; JA19. For each alternative, the Postal Service evaluated potential impacts on transportation, traffic, noise, hazardous waste, and air quality, including impacts of greenhouse gas emissions. JA46-48, JA314-55. Where applicable, the Postal Service relied on EPA-endorsed modeling, including the Motor Vehicle Emission Simulator (MOVES) model for measuring direct vehicle emissions and the Greenhouse Gases, Emissions, and Energy use in Technologies (GREET) model for measuring lifecycle greenhouse gas emissions. JA59-77, JA322-44.

The Postal Service went beyond the requirements of NEPA to provide the public with additional insight into its decision-making. The EIS included data on the "wide range of cost factors" that the Postal Service used to compare the total cost of owning and operating the potential suppliers' prototypes. JA7, *see* JA40, JA269-72, JA309-12. The Postal Service used that data to "determine 'best value'" when comparing prototypes. JA7. Likewise, even though executive orders on environmental justice "do not apply to the Postal Service," it "fulfill[ed] the spirit" of those orders by considering impacts on environmental-justice "communities of concern." JA50.

Based on the EIS, the Postal Service, in February 2022, issued a ROD that selected its preferred alternative to purchase and deploy 50,000-165,000 NGDVs, at least 10% of which would be electric. JA2-15. That alternative gave the Postal Service the "flexibility to acquire significantly more [electric] NGDV[s] should funding become available." JA5. After issuing the ROD, the Postal Service ordered 50,000 NGDVs from Oshkosh. JA2966-68. Although the order provided that 20% of those vehicles would be electric (JA3048), the NGDV contract expressly empowered the Postal Service to modify the vehicle mix. JA897-98. The Postal Service later "changed the model mix" for that order to 70% electric vehicles. JA2162.

In response to a congressional request, the Postal Service's Office of Inspector General (OIG) audited the EIS. Ex. C, Pls.' Req. for Judicial Notice. OIG concluded that the EIS "followed

- 7 -

DEFENDANTS' FINAL OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT, Case Nos. 3:22-cv-2576; 3:22-cv-2583

NEPA's procedural requirements." *Id.* at 1. OIG also suggested that, if the Postal Service were to modify the program and conduct further NEPA review, it should consider evaluating additional alternatives and update certain emissions estimates to "improve the reliability and reasonableness" of its analysis "for decision makers and stakeholders." *Id.* The Postal Service incorporated many of OIG's suggestions into the supplemental NEPA review described below. JA1348.

### iii. Changing operational needs and increased funding led the Postal Service to modify the program

In July 2022, the Postal Service announced that it was considering modifying the program due to, among other factors, the increasingly "critical need" to quickly replace old vehicles. JA1041-42; *see* JA1036. Since Oshkosh would take several years to ramp up NGDV production, the Postal Service considered "expand[ing] the scope of vehicle types being considered" to provide "greater flexibility" to deploy new vehicles. JA951. Such purchasing flexibility would also make the program "more responsive" to "evolving operational strategy, technology improvements, and changing market conditions," and would "accelerate fleet electrification." JA951.

Soon thereafter, Congress allocated $3 billion for the Postal Service to purchase zero-emission delivery vehicles and charging infrastructure. Inflation Reduction Act of 2022 (IRA), Pub. L. No. 117-169, § 70002, 136 Stat. 1818, 2086-87. The additional funding enabled the Postal Service "to consider increasing and accelerating" electric vehicle purchases. JA951.

In December 2022, the Postal Service issued a press release on its vehicle-electrification efforts. Ex. D, Pls.' Req. for Judicial Notice (*EV Press Release*). Consistent with its earlier commitment to acquire more electric vehicles "should additional funding become available" (JA4-5), the Postal Service announced an "anticipated plan" to acquire, by 2028, 60,000 NGDVs, at least 75% of which would be electric. *EV Press Release*. The Postal Service further announced that it "expected" to supplement the NGDVs with COTS vehicles, a significant portion of which would be electric. *Id.* The press release did not commit the Postal Service to a particular course of action. It expressly acknowledged that the Postal Service would need to develop a "Supplemental Environmental Impact Statement" to "assess the potential environmental impacts of vehicle purchase alternatives, likely including those" in the press release. *Id.*

Based on those developments, the Postal Service, in February 2023, entered into supplier

contracts to purchase 9,250 electric and 9,250 gas COTS vehicles. JA2167-214, JA2226-72. Like the NGDV contract, the COTS contracts were "contingent upon the satisfactory completion of the NEPA . . . process," which could "require[]" the Postal Service to "modify the quantity, type, or delivery timeline for vehicles purchased." JA2175, JA2235; *see* JA2255-56, JA2195-96 (authorizing the Postal Service to "terminate" the contracts "for its sole convenience"). A standard provision required payment for work performed. JA2255-56, JA2195-96.

### iv.    The Postal Service prepared an SEIS to analyze the environmental impacts of program modifications

The Postal Service developed a supplemental environmental impact statement (SEIS) to analyze the environmental impacts of potential changes to the program in accordance with its, and the Council on Environmental Quality's (CEQ), NEPA regulations. *See* 39 C.F.R. § 775.11(f)(1)(i); 40 C.F.R. § 1502.9(d) (2023).[4] The Postal Service solicited two rounds of comments on the SEIS. JA1036. The first round concerned the scope of the environmental review for the potential program changes (JA1041, JA1049); the second round sought feedback on the draft SEIS (JA1369). The Postal Service incorporated comments it received into the SEIS. JA953.

The SEIS evaluated the environmental impacts of three alternatives to replace 106,480 old vehicles: (1) the Postal Service's preferred alternative to, over six years, deploy 60,000 NGDVs and 46,480 COTS vehicles, 62% of which will be electric; (2) an alternative to, over eight years, deploy 106,480 NGDVs, 62% of which will be electric; and (3) a no-action alternative to proceed under the original ROD. JA958-64, JA966-1011. The Postal Service considered "multiple mission-critical factors" to determine which additional alternatives to analyze, including the "urgent need to replace . . . aging vehicles," "route suitability" for electric vehicles, "upfront acquisition costs," and the agency's "evolving vehicle procurement strategy." JA956. The preferred alternative met "performance, safety and ergonomic requirements," leveraged all of the IRA funding, and "accelerate[d]" operational and safety goals. JA940.

In analyzing impacts from vehicle emissions, the SEIS used an updated version of EPA's

---

[4] CEQ recently revised its NEPA regulations. 89 Fed. Reg. 35442 (May 1, 2024). Those revisions took effect July 1, 2024. Unless otherwise noted, citations are to the CEQ regulations in effect when the Postal Service issued the Revised ROD. Plaintiffs rely on new language not contained in the operative CEQ regulations. *See* Br. 3 (quoting 40 C.F.R. § 1500.1(a) (2024)).

MOVES model and again used the GREET model. JA981-94, JA1719-31. The SEIS included up-dated analysis on the social cost of greenhouse gas emissions based on recent CEQ modeling. JA984-85, JA989, JA992, JA995. The Biden Administration commended the Postal Service for conducting this analysis.[5] The Postal Service concluded that its preferred alternative was not incon-sistent with any state or local laws. JA1359; *see* JA1336, JA1640-41.

Like the EIS, the SEIS included information beyond that required by NEPA to provide in-sight into the decision-making process. The SEIS explained that due to the growing need to replace unreliable vehicles, the program will include some gas vehicles. Compared to electric vehicles, gas vehicles that meet postal operational needs are more widely available, "significant[ly]" cheaper, and can be deployed right away without installing charging stations, which is a lengthy undertaking. JA956-58. Due to the immediately available IRA funding and improved finances, the Postal Service evaluated upfront cost, rather than total cost of ownership, to determine the electric-gas vehicle mix. JA958. The Postal Service is using IRA funds to "accelerate" charging-station installation in order to deploy electric vehicles sooner and to "mitigate . . . pricing risk" in order to "stabilize" vehicle acquisitions. *Id.* The SEIS also contained detailed environmental-justice analysis. JA1002-09, JA1671-92. The Postal Service "anticipates deploying a large portion" of the new vehicles to 414 "[c]andidate [s]ites," 84% of which are in environmental-justice communities. JA1005. That will "significantly reduce direct air emissions" from mail delivery in those communities. *Id.*

EPA submitted comments on the SEIS that primarily recommended strategies to "increase the [program's electric-vehicle] commitment to greater than 62 percent." JA1790; *see* JA1789-96. EPA did not raise concerns about the underlying environmental analysis and noted its "appre-ciat[ion]" for the Postal Service's environmental-justice analysis. JA1796; *see* JA931.

In December 2023, the Postal Service issued a Revised ROD that modified the program to authorize the "purchase and deployment" of 106,480 NGDVs and COTS vehicles. JA930; *see* JA928-36. Sixty-two percent of the new vehicles will be electric. *Id.* An all-gas fleet would accom-plish program objectives, but the Postal Service "significantly increase[d]" electric vehicle pur-chases because it is "committed to reducing . . . greenhouse gas emissions in a fiscally responsible

---

[5] White House, *Fact Sheet: Biden-Harris Administration Announces New Actions to Reduce Green-house Gas Emissions and Combat the Climate Crisis* (Sept. 21, 2023), https://perma.cc/AVA3-NNEM.

and mission-capable manner." JA934. The Revised ROD responded to EPA's comments on the electric-gas mix. It explained that, given the currently limited availability of electric vehicles that meet postal operational needs, further increasing their percentage would slow vehicle replacement, which would increase environmental impacts, jeopardize the Postal Service's service mission, and create safety risks for mail carriers and the public. JA931-32.

The Revised ROD is only the first stage of modernizing the postal fleet. JA932. For future vehicle procurements, the Postal Service plans to take advantage of any "positive trends" in cost and technological improvements to accomplish a "fiscally responsible and mission-capable roll-out" of electric vehicles. JA941, JA1628; *see* JA958.

### B.    Procedural History

Three sets of plaintiffs challenged the original ROD: the governments and organizations in these consolidated cases, and the Natural Resources Defense Council and United Auto Workers in a New York case, NRDC v. DeJoy, No. 22-cv-3442 (S.D.N.Y.). These consolidated cases were originally assigned to Judge James Donato, who granted Oshkosh's motion to intervene.

Over plaintiffs' oppositions, both courts stayed the lawsuits when the Postal Service began preparing the SEIS to modify the program. California Dkt. 121; NRDC Dkt. 67. After the Postal Service issued the Revised ROD to replace half its fleet with mostly electric vehicles, the New York plaintiffs voluntarily dismissed their action. NRDC Dkt. 84. In these cases, the Court lifted the stays and the plaintiffs filed "supplemental" complaints, California Dkt. 149.

### ARGUMENT

### I.    PLAINTIFFS LACK STANDING TO BRING THEIR CLAIMS

Article III empowers the federal courts to decide only "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. A case or controversy exists only if the plaintiff has standing, a requirement that "ensures that [the] federal courts decide only 'the rights of individuals,'" rather than "exercise general legal oversight of the Legislative and Executive Branches." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021). Standing prevents federal courts from operating as "open forum[s] . . . to press general complaints about the way in which government goes about its business." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (*AHM*).

The "irreducible constitutional minimum of standing" has "three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* Second, the injury must be "fairly . . . trace[able] to the challenged action of the defendant." *Id.* at 560-61. "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561. The plaintiff "bears the burden of establishing these elements" (*id.*) and must do so on summary judgment with "specific facts" as opposed to "mere allegations." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013). Where a plaintiff "is not himself the object of the government action . . . he challenges," standing "is ordinarily 'substantially more difficult' to establish." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Plaintiffs have not established standing here.

### A.    Plaintiffs Have Not Established A Cognizable Injury-In-Fact

Plaintiffs fail to establish an injury-in-fact, which is a "hard floor of Article III jurisdiction." *Summers*, 555 U.S. at 497. They demonstrate no "concrete" injury. *Lujan*, 504 U.S. at 560-61. Further, their alleged harms are "speculative" and "hypothetical," not imminent. *Id.*

### 1.    Plaintiffs Have Not Shown That The Program Will Harm Them

Only a plaintiff who demonstrates that he will suffer a "distinct and palpable injury to himself" can "make out a case or controversy between himself and the defendant." *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99-100 (1979). In other words, the injury "must actually exist." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). None of plaintiffs' alleged harms qualifies.

Plaintiffs contend that they were injured by "procedural violations" of NEPA, specifically the failure to "consider all reasonable alternatives." Br. 18. That argument contravenes the basic tenet of standing that a plaintiff asserting a procedural violation must show that "the procedures in question are designed to protect some threatened concrete interest that is the ultimate basis of his standing." *Lujan*, 504 U.S. at 573 n.8; *see id.* at 573-74. The Ninth Circuit has repeatedly applied that teaching in NEPA cases to hold that a "free-floating assertion of a procedural violation . . . does not constitute an injury in fact." *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th Cir. 2005); *see, e.g.*, *W. Watersheds Project v. Grimm*, 921 F.3d 1141, 1146 (9th Cir. 2019)

(collecting decisions). Plaintiffs also assert a "procedural right" to comment during the NEPA process. Br. 18-19. But they do not argue that the Postal Service deprived them of that right. Indeed, plaintiffs submitted multiple rounds of comments on the EIS and SEIS. JA133-35, JA158-205, JA221-44, JA1268-77, JA1278-80, JA1281-301, JA1540-66, JA1589-609. Regardless, the "deprivation of a procedural right" cannot "create Article III standing" "without some concrete interest that is affected by the deprivation." *Summers*, 555 U.S. at 496. Plaintiffs' theories of procedural injury flout the modern understanding of the injury requirement.

Plaintiffs next argue that the program "threaten[s] to cause" harm that the government plaintiffs' policies address. Br. 19. That too is not a concrete injury. Abstract (and, in this case, nonexistent, Part II.B.5, *infra*) friction between state and federal law is not an "actual injury." *Sturgeon v. Masica*, 768 F.3d 1066, 1074 (9th Cir. 2014), *vacated on other grounds*, 577 U.S. 424 (2016).

Finally, Plaintiffs argue that the program will harm them and their members by "increas[ing] pollution" (Br. 20) but that is flat wrong. The program will *reduce* air pollution by replacing 106,480 32-year-old gas vehicles on a one-for-one basis with 66,230 electric vehicles and 40,250 much cleaner gas vehicles. JA956, JA1762-63, JA988-89, JA1016. The new gas vehicles emit significantly less pollution than the old vehicles: For example, during city delivery they emit 71.2% less particulate matter, 2.76% less carbon monoxide, 30% less carbon dioxide, and 73% less sulfur dioxide. *Compare* JA1704, *with* JA1708. The Biden Administration thus explained that the program will "result[] . . in cleaner air [and] better health." *Presidential Federal Sustainability Awards*.

Plaintiffs cannot suffer a concrete injury from a program that will substantially decrease their exposure to air pollution. As the Supreme Court recently explained, it "would be quite strange to think that a party experiences an Article III injury by . . . not being *more* affected by" agency action. *DOE v. Brown*, 600 U.S. 551, 564 (2023). Accordingly, courts have held that plaintiffs lack standing to challenge agency actions that benefit them. Consider *Nuclear Information & Resource Service v. NRC*, 457 F.3d 941 (9th Cir. 2006), where citizen groups brought NEPA claims challenging rules for transporting radioactive material, which were more stringent than previous regulations. *Id.* at 945-47. The groups alleged that transporting radioactive material would cause their members to suffer health-related harms. *Id.* at 951. But the members' health interests were "served,

- 13 -

not harmed, by the enactment of" the new rules, which were "more protective" than the previous regime. *Id.* at 953-54. The Ninth Circuit thus held that plaintiffs suffered no injury-in-fact. *Id.* at 952-54. It explained that a government action does not "harm a concrete interest when the action [leads] to a result that [is] *beneficial*" to the challenger. *Id.* at 954; *see, e.g.*, *Michigan v. EPA*, 581 F.3d 524, 529 (7th Cir. 2009) ("Michigan's air can only benefit from" an EPA administrative ruling); *Idaho Farm Bureau Fed'n v. Babbitt*, 900 F. Supp. 1349, 1363 (D. Idaho 1995) (listing mollusks was "beneficial to the mollusks and their habitat, rather than harmful"). Here too, plaintiffs suffer no harm from an agency action that resounds to their benefit.

### 2.    Plaintiffs Have Not Shown Any Imminent Injury

Plaintiffs fail to establish an injury-in-fact for a separate, independent reason: They demonstrate no imminent harm. The power of the federal courts is restricted to redressing "actual or imminent" injuries that are "not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560. A plaintiff alleging a future harm thus must "demonstrate that the threatened injury is certainly impending." *Clapper*, 568 U.S. at 412. Neither set of plaintiffs satisfies that requirement.

### i.    The organization plaintiffs have not identified any member who faces an imminent injury

No organization plaintiff argues that it will suffer "an injury in its own right." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). Rather, each asserts "standing solely as the representative of its members." *Id.* To establish representational standing, an organization must show that "its members would otherwise have standing to sue in their own right." *Id.* The organization must "establish[] that at least one identified member had suffered or would suffer harm" (*Summers*, 555 U.S. at 498) by showing a "reasonable probability of the challenged action's threat" to the member's concrete interests. *Citizens for Better Forestry v. USDA*, 341 F.3d 961, 972 (9th Cir. 2003).

No member declaration demonstrates imminent harm from new gas vehicles. Assertions about past or current vehicle emissions from old delivery vehicles (Reinhart Decl. ¶¶ 6-8; Makarem Decl. ¶¶ 6-9; Dykiel Decl. ¶ 6) do not show "imminent future injury" from new vehicles. *Summers*, 555 U.S. at 495; *see Lujan*, 504 U.S. at 564. Several declarants voice concerns about future impacts to local air quality from gas vehicles (Molidor Decl. ¶ 10; Reinhart Decl. ¶ 10; Dykiel ¶ 7; Isenberg

Decl. ¶ 8) but those speculative harms are not "reasonably probable" (*Citizens for Better Forestry*, 341 F.3d at 969) let alone "certainly impending." *Clapper*, 568 U.S. at 401-02. Most of the new vehicles will be electric; only 38% will be gas. JA956. And the Postal Service is currently replacing only half of its fleet. JA29. Each declarant thus has only a 19% chance of living on a mail route that may be serviced by a new, less-polluting gas vehicle. Indeed, several declarants acknowledge that their alleged harms will arise only "[*i*]f the Postal Service's gas[] vehicles pass through [their] neighborhood[s]." Reinhart Decl. ¶ 10 (emphasis added); *see* Molidor Decl. ¶ 10.

An alleged harm that has only a 19% chance of arising is not imminent. *See, e.g.*, *Mont. Env't Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1189 n.4 (9th Cir. 2014) (injury risk of 45% insufficient); *Beck v. McDonald*, 848 F.3d 262, 276 (4th Cir. 2017) (injury risk of 33% insufficient); *Sumanti v. Strange*, 2017 WL 6492679, at *3 (W.D. Wash. Dec. 19, 2017) (injury risk of 35-40% insufficient); *see also McMorris v. Carlos Lopez & Assocs.*, 995 F.3d 295, 300 (2d Cir. 2021) (a "possible" or even "reasonabl[y] likel[y]" future injury does not confer standing). And the organi-zations cannot satisfy the imminence requirement by alleging "a statistical probability that some of th[eir] members" live on routes that gas vehicles will service. *Summers*, 555 U.S. at 497; *see id.* at 495. Accordingly, the organization plaintiffs do not allege an imminent injury-in-fact.

### ii. The government plaintiffs have not shown any impending harm to their proprietary interests

The government plaintiffs likewise fail to establish an imminent injury. Parties generally cannot base standing on third-party interests (*Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004)) and states lack "standing as *parens patriae* to bring an action against the Federal Government." *Haa-land v. Brackeen*, 599 U.S. 255, 295 & n.11 (2023). Accordingly, the government plaintiffs cannot sue "on behalf of [their] citizens and residents" (LaLone Decl. ¶ 2) to protect "public health." Br. 20; *see* LaLone Decl. ¶ 15 (seeking to "protect[] the health and safety of New York's resi-dents"); Johnson Decl. ¶¶ 8-9, 13, 16-17 (alleging harm to "New Yorkers' health").

Nor do the government plaintiffs demonstrate an imminent injury based on their proprietary interests. Plaintiffs' vague, one-sentence argument that the program will "contribute to climate change and damage . . . parks . . . and other resources" that they own (Br. 20) is insufficient on summary judgment to establish a certainly impending injury. *See Clapper*, 568 U.S. at 402.

- 15 -

Further, the government standing declarations contain no specific facts establishing that any harm is imminent. Speculation about "increased costs for [New York] City" from asthma-related hospital visits (Johnson Decl. ¶ 11) does not show such costs are "certainly impending" (*Clapper*, 568 U.S. at 412)—especially when the Postal Service has yet to determine where it will deploy gas vehicles. The same is true of vague statements that "[s]ignificant expansions of fleets of gas-powered . . . vehicles" will "increase[] . . . climate change impacts to the [California] Park System" (Chamberlin Decl. ¶ 15) and properties owned by New York. LaLone Decl. ¶¶ 39, 42, 48-49. The Postal Service is shrinking—not "significant[ly] expan[ding]"—its gas-powered fleet by replacing more than 66,000 gas vehicles on a one-for-one basis with electric vehicles, and the new gas vehicles have lower emissions too. Plaintiffs also cite (Br. 19-20) *Massachusetts v. EPA*, 549 U.S. 497 (2007), but the state plaintiff there alleged, with supporting expert declarations, that EPA's decision not to regulate greenhouse gas emissions would cause the imminent loss of specific percentages of property that it owned. *Id.* at 522-23. By contrast, the government plaintiffs here do not allege any measurable, imminent impact that the program will have on specific proprietary interests.

**B.     The Government Plaintiffs Have Not Established That The Program Will Cause Their Alleged Injuries**

Causation "screens out plaintiffs who were not injured by the defendant's actions." *AHM*, 602 U.S. at 381. One function of that requirement is to "rule[] out attenuated links" where the alleged harm is "far removed from [the] distant (even if predictable) ripple effects" of the challenged government action. *Id.* at 383. Neither of the government plaintiffs' butterfly-effect theories establishes the close causal link needed for Article III standing.

1. The government plaintiffs argue that "increased pollution" from the program will "lead[] to increased hospitalization and emergency room costs" for New York City. Br. 20. That "loose approach to causation" does not establish standing. *AHM*, 602 U.S. at 392. Indeed, the Supreme Court recently rejected a similar argument, where plaintiffs contended that relaxed regulation of mifepristone would increase patient complications, resulting in "downstream economic injuries" to doctors. *Id.* at 386. Those claims "lack[ed] record support and [were] highly speculative." *Id.* at 390. Further, the "chain of causation" between the regulations and the economic loss was "simply too attenuated." *Id.* at 391. Endorsing the plaintiffs' approach, the Court held, would have permitted

- 16 -

federal-court challenges to "almost any policy affecting public health." *Id.* at 392.

That reasoning compels the same result here. Plaintiffs speculate that deploying 40,250 gas postal vehicles nationwide that pollute far less than existing vehicles will increase asthma-related hospitalization costs for one city. But New York City's declarant offers no "evidence tending to suggest" that deploying a small number of less-polluting gas vehicles in the City will "cause[] an *increase* in" hospital admissions. *Id.* at 390 (emphasis added). In any event, the chain of causation between new gas vehicles and increased hospitalization costs is too attenuated to establish standing. Just as a doctor lacks "standing to sue because she may need to spend more time treating asthma patients" due to a rollback of emissions standards (*id.* at 391) so too the City lacks standing because it allegedly will pay for more asthma-related hospital visits due to a small number of less-polluting gas vehicles on its streets. As in *AHM*, plaintiffs' approach here would permit challenges to practically every federal action claimed to affect public health.

2. Plaintiffs also argue that "increased pollution" from the program will "contribute to climate change and damage" of properties owned by California and New York. Br. 20; *see* LaLone Decl. ¶¶ 39, 42, 48-49. But deploying a small number of less-polluting gas postal vehicles is too "far removed from [those] ripple effects" to establish standing. *AHM*, 602 U.S. at 383. Plaintiffs cite no decision endorsing such an attenuated theory. Their only cited causation case was reversed. *Pub. Citizen v. DOT*, 316 F.3d 1002 (9th Cir. 2003), *rev'd*, 541 U.S. 752 (2004) (discussed at Br. 19-21). And that case involved alleged health-related harms to individuals from increased emissions in their neighborhoods. *Id.* at 1015-16. Regardless, more recent decisions provide "clarifying principles [and] . . . clear rules" on the limits of climate-change theories of causation. *AHM*, 602 U.S. at 384.

For instance, in *Washington Environmental Council v. Bellon*, 732 F.3d 1131 (9th Cir. 2013) (*WEC*), organizations argued that Washington's decision not to regulate emissions from five oil refineries contributed to climate change, causing their members to suffer health and other injuries. *Id.* at 1140. That causal link was "too tenuous to support standing" because greenhouse gas emissions are "not a localized problem . . . but a global occurrence." *Id.* at 1144, 1147. The refineries were responsible for a small percentage of emissions in Washington. *Id.* at 1143. But "a

multitude of independent third parties"—"both within and outside the United States"—were responsible for the "global climate change" that "contribut[ed] to Plaintiffs' injuries." *Id.* at 1143-44.

The Ninth Circuit contrasted the *WEC* plaintiffs' theory with that in *Massachusetts v. EPA*. Even if "special solicitude" were warranted, the *WEC* court explained, the plaintiffs would still lack standing: Whereas the "U.S. motor-vehicle sector" at issue in *Massachusetts* "accounted for 6% of *world-wide* carbon dioxide emissions," there was no evidence that the refineries "'meaningful[ly] contribut[ed]' to global [greenhouse gas] levels." *Id.* at 1145-46 (quoting *Massachusetts*, 549 U.S. at 525); *see, e.g.*, *Amigos Bravos v. BLM*, 816 F. Supp. 2d 1118, 1136 (D.N.M. 2011); *cf. Juliana v. United States*, 947 F.3d 1159, 1169 (9th Cir. 2020) (distinguishing *WEC* where climate-change injuries were caused by "a host of federal policies" accounting for 25% of fossil fuel extracted nationally rather than "isolated agency decisions").

This case is on all fours with *WEC*. California's and New York's declarants speculate that the program will "increase[] climate risk and climate change impacts to" state-owned properties. Chamberlin Decl. ¶ 15; *see* LaLone Decl. ¶¶ 39, 42, 48-49. Those "generalized statements of 'contribution'" do not supply a "plausible scientific or other evidentiary basis" to conclude that emissions from postal vehicles are the source of the States' climate-change injuries. *WEC*, 732 F.3d at 1142. More to the point, plaintiffs offer no evidence that emissions from an "isolated agency decision[]" (*Juliana*, 947 F.3d at 1169) to deploy a small number of less-polluting gas postal vehicles will "meaningful[ly] contribut[e]" (*WEC*, 732 F.3d at 1145) to the global greenhouse gas emissions that they claim "will lead to . . . costly impacts on" state-owned properties. Br. 20.

## II.    PLAINTIFFS' CLAIMS FAIL ON THE MERITS

Even if plaintiffs had established Article III standing, their claims would fail. The PRA prohibits plaintiffs' arbitrary-and-capricious challenges to the Postal Service's discretionary determination of the electric-gas mix of its fleet and the analysis supporting that decision, which were reasonable in any event. Plaintiffs' narrow NEPA claims are also meritless.

### A. Plaintiffs Cannot Challenge The Composition Of The National Postal Fleet And The Postal Service's Decision Was Reasonable In Any Event

Under the APA, a "person suffering legal wrong because of agency action . . . is entitled to judicial review" of the action, which a court may set aside if it is "arbitrary [or] capricious." 5 U.S.C. §§ 702, 706(2)(A). But the PRA generally prohibits APA challenges to actions by the Postal Service (39 U.S.C. §410(a)), which requires operational freedom to efficiently deliver the mail and make related business decisions, like "selecting modes of transportation." *Id.* § 101(f). Plaintiffs thus cannot challenge the selected electric-gas vehicle mix or the prioritization of upfront cost over total ownership cost. While plaintiffs tag those as NEPA arguments (Br. 31-35), in reality they are APA arbitrary-or-capricious challenges to Postal Service discretionary decisions that are unrelated to its environmental review under NEPA.

Even if plaintiffs could challenge those decisions, its arguments would still fail. APA review is "highly deferential" to the agency (*Nw. Ecosystem All. v. FWS*, 475 F.3d 1136, 1140 (9th Cir. 2007)), whose action is presumed valid "if a reasonable basis exists for its decision." *Ctr. for Biological Diversity v. BLM*, 833 F.3d 1136, 1146 (9th Cir. 2016). Deference is "especially appropriate" where the "decision involves a high level of technical expertise." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*, 415 F.3d 1078, 1093 (9th Cir. 2005). The Postal Service reasonably explained the basis for its vehicle-procurement decisions.

### 1. Plaintiffs' Challenge To The Electric-Gas Vehicle Mix Fails

Plaintiffs repeatedly argue that the Postal Service "provide[d] no grounds" for the selected electric-gas vehicle mix. Br. 31-32. But that argument has nothing to do with NEPA, which requires agencies to analyze the environmental impacts of their actions. 42 U.S.C. § 4332(2)(C). Plaintiffs' claim that the Postal Service did not sufficiently "explain[] how or why" it selected the 62%-electric alternative (Br. 31) is a classic APA argument that an agency did not "articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Such a claim—that an action is "arbitrary and capricious under the APA"—is "distinct" from the claim that an agency "failed to satisfy NEPA's procedural requirements." *Ranchers Cattlemen*, 415 F.3d at 1093; *see Oceana, Inc. v. Ross*, 275 F. Supp. 3d 270, 296 (D.D.C. 2017) (similar); *cf. Akiak*, 213 F.3d at 1145 (evaluating only the "validity of the Postal Service's"

- 19 -

NEPA analysis). The PRA forecloses the former. *See* pp. 3-4, *supra*.

In any event, the Postal Service provided a well-reasoned explanation for its selected vehicle mix. The Postal Service must urgently replace increasingly unreliable, 32-year-old vehicles to continue to fulfill its mandate to "provide prompt, reliable, and efficient services" "six days a week" to 165 million addresses. 39 U.S.C. § 101(a)-(b); *see* JA35-37, JA941, JA955. When replacing vehicles, it must "give highest consideration to the prompt, economical, consistent, and reliable delivery of all mail." 39 U.S.C. § 101(f). Accordingly, when selecting the electric-gas vehicle mix, the Postal Service considered: operational requirements (JA957, JA1630-31, JA1641); the availability of vehicles that meet those requirements (JA956-97, JA932); budget constraints (JA958, JA1625-26, JA1649); the 86%-higher upfront cost of electric vehicles compared to gas vehicles (JA958, JA1649); and the urgent need to replace old vehicles (JA956-57). That evaluation was also based on hundreds of thousands of hours of technical analysis on vehicle capabilities (JA30-32, JA264, JA274) to which courts are especially deferential. *Ranchers Cattlemen*, 415 F.3d at 1093. Those straightforward explanations are more than sufficient to satisfy "narrow" arbitrary-and-capricious review. *State Farm*, 463 U.S. at 43.

Plaintiffs argue that the Postal Service did not "provide analytic support for . . . select[ing] 62 percent" electrical vehicles (Br. 32) but the APA does not demand precision. Rather, an agency must "articulate a satisfactory explanation for its action" so that its "path may reasonably be discerned." *State Farm*, 463 U.S. at 43. As discussed, the Postal Service did that through comprehensive discussions of the factors on which it based its decision. Further, a memorandum from the Postal Service's Senior Vice President of Finance & Strategy discussed in detail and with supporting pricing data the "financial considerations" for selecting the vehicle mix, including the "volatile" vehicle market, variable charging-station expenses, and the need to purchase electric vehicles "in the most cost-efficient and least risk-incurring manner." JA2216-24. The memorandum also explained the need to balance electrification goals with budget requirements, such as for "needed capital improvements," "facility and vehicle maintenance," and maintaining "sufficient liquidity to conduct regular operations and plan for the possibility of future adverse events." JA2216.[6]

---

[6] Plaintiffs do not challenge the memorandum's substance but rather deride it as "self-serving" because it was issued the day before the Revised ROD. Br. 32. n.9. That baseless speculation

Plaintiffs' other vehicle-mix arguments also lack merit. The Postal Service reasonably explained why it did not purchase other "models of available electric vehicles" used by certain competitors. Br. 27; *see id.* at 28, 31. A very limited number of currently available commercial electric vehicles meet Postal Service operational needs. *See* JA932, JA956-57, JA964, JA1650-51, JA1771. The Postal Service prefers using right-hand-drive vehicles so that carriers can safely, efficiently, and ergonomically deliver to curbside residential mailboxes. JA47, JA964-65, JA1774. None of the currently available right-hand-drive electric vehicles meet Postal Service operational and financial requirements. *See* JA961, JA964-65, JA1650-51. Further, competitors' electric vehicles are not designed for a "unique slow speed, stop and start operating environment" with "hundreds of daily hard accelerations and decelerations," which postal vehicles must navigate. JA274-75, JA957. The Postal Service also decided that it would purchase only electric vehicles that can operate for at least 70 miles on a single charge based on maximum route lengths; the additional battery drain from the unique stop-and-start operating environment; and the need to maintain flexibility for additional, unexpected trips. JA957. Very few currently available commercial electric vehicles meet that requirement. JA956-57.

Plaintiffs argue (Br. 32) that the Postal Service should have considered lower-cost batteries and charging stations or alternative funding, but the vehicle mix was reasonably based on market realities. None of the potential suppliers in the competitive solicitations for NGDV and COTS vehicles offered lower-cost battery options. JA1634. Postal Service engineers considered cheaper charger-to-electric-vehicle ratios but ultimately decided to follow the same, one-charger-to-one-vehicle approach of other federal agencies due to the "risk [of] degrading" battery ranges from intermittent charging; the need to maintain "operational flexibility" when electric vehicles must "service . . . longer-than-expected" routes; and the "additional costs for managing vehicle movement between charging stations across hundreds of sites." JA1341-42, JA2843. The SEIS also explained that the Postal Service had extensively researched alternative funding sources but determined that the program was not eligible. JA1646. Thus, even if plaintiffs could challenge the

---

contravenes the "presumption of regularity" that attaches to agency decisions. *Biden v. Texas*, 597 U.S. 785, 811 (2022). Regardless, it is common sense that an agency would "summarize[] the financial considerations" underlying its decision at the conclusion of the decision-making process. JA2216.

1    vehicle mix, the Postal Service reasonably explained its decision.

2    **2.    Plaintiffs' Challenge To The Consideration Of Upfront Costs Fails**

3    Plaintiffs' argument that the Postal Service should have prioritized "total cost of ownership"

4    rather than "upfront costs" in selecting vehicles (Br. 33-35) is another attempted end-run around

5    Congress's decision to "exempt [the Postal Service] from review under the [APA]." *Mittleman*, 757

6    F.3d at 305. Plaintiffs cite NEPA regulations requiring that an agency identify relied-upon meth-

7    odologies and scientific information (Br. 33) but the Postal Service's cost modeling was not part of

8    its NEPA analysis of "*environmental* effects." 42 U.S.C. § 4332(2)(C)(i) (emphasis added). "NEPA

9    does not require [an agency] to examine the economic consequences of its actions" (*Ass'n of Pub.*

10   *Agency Customers, Inc. v. BPA*, 126 F.3d 1158, 1186 (9th Cir. 1997)) let alone dictate a particular

11   financial model for agency decision-making. *See* JA932. To be sure, the EIS and SEIS discussed

12   vehicle costs to provide the public with additional detail on the Postal Service's decision-making.

13   *See* pp. 7, 10, *supra*; JA933. But that did not somehow convert the cost analysis into "environmental

14   effects" review subject to the requirements of NEPA. Plaintiffs thus cannot challenge the Postal

15   Service's cost modeling as arbitrary and capricious. That limitation is especially important here,

16   where Congress decided to "place the Service on a business like footing" by withdrawing its pur-

17   chasing decisions from APA review (*Currier*, 379 F.3d at 725) and directing it to give "highest

18   consideration" to specified factors when purchasing vehicles. 39 U.S.C. § 101(f).

19   Regardless, the cost analysis was reasonable. A "total cost of ownership model" includes

20   long-term expenses, such as maintenance and fuel, in calculating lifetime vehicle cost. JA311. The

21   Postal Service relied on that model in the ROD, which took a sliding-scale approach: purchasing

22   50,000-165,000 NGDVs, at least 10% of which would be electric. JA4, JA1625. Circumstances

23   changed after the Postal Service issued the ROD. The need to replace unreliable vehicles grew

24   increasingly urgent and the Postal Service received $3 billion in IRA funding to support fleet elec-

25   trification. JA958, JA1625. "[L]everag[ing] the IRA funding by using the entire amount" up front

26   enabled the Postal Service to "maximize the quantity of [electric vehicles] at the least possible

27   financial and operational risk." JA2219. Prioritizing upfront cost also allowed the Postal Service to

28   replace (and electrify) its fleet more quickly because optimizing long-term costs would have

- 22 -

required the Postal Service to "wait[] for [electric vehicles] to become available at the most competitive prices." JA2220, JA1625. Moreover, as discussed, cost was only one of several factors that the Postal Service considered. *See* JA957-58.

Plaintiffs are incorrect (Br. 34-35) that prioritizing upfront cost ran afoul of Postal Service guidance, U.S. Postal Serv., *Supplying Principles and Practices* (Apr. 1, 2023), https://about.usps.com/manuals/spp/html/welcome.htm. That guidance is a supply-chain management tool for contracting officers that "supplement[s] the Postal Service's purchasing regulations." *Id.*, Introduction. Postal Service officials consulted the guidance for the Revised ROD. JA932-33. Plaintiffs acknowledge that the guidance does not "require a [total cost of ownership analysis] for every purchase," but insist that the Postal Service nonetheless should have conducted one because the guidance "encourages" such analysis "for 'complex' decisions." Br. 35. Yet the guidance repeatedly states that it is "intended to provide for flexibility and discretion in [its] application to specific business situations." *Supplying Principles and Practices*, Introduction; *see id.*, Best Value, (emphasizing the guidance's "broad flexibility"). The Postal Service used its discretion to apply the guidance in evaluating vehicle cost for the unique purchasing scenario here. JA932-33.

## B.    The Postal Service Complied With NEPA's Process Requirements

Although plaintiffs may challenge the Postal Service's NEPA analysis, the "scope" of judicial review under NEPA is "narrow." *Akiak*, 213 F.3d at 1146. The Postal Service had discretion to select the vehicles it "deem[ed] necessary or convenient" to deliver the mail. 39 U.S.C. § 401(5). "NEPA imposes only procedural requirements" (*Pub. Citizen*, 541 U.S. at 756) to analyze "reasonably foreseeable environmental effects" of that decision. 42 U.S.C. § 4332(2)(C)(i). Accordingly, the Court's role is to "simply . . . ensure" that the Postal Service "adequately considered and disclosed the environmental impact of" the program. *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97-98 (1983). The Postal Service fully complied with those requirements.

### 1.    The NEPA Review Was Not Predetermined

#### i.    The vehicle supplier contracts were expressly contingent on later NEPA analysis

The Postal Service's supplier contracts did not violate NEPA. CEQ regulations prohibit agencies from "[l]imit[ing] the choice of reasonable alternatives" or "commit[ting] resources

prejudicing selection of alternatives." 40 C.F.R. §§ 1502.2(f), 1506.1(a)(2) (2023). Doing so "predetermines the outcome of [environmental] analysis in violation of NEPA." *City of Los Angeles v. FAA*, 63 F.4th 835, 848 (9th Cir. 2023). An agency does not violate this requirement if it "retain[s] the authority to change course or alter the plan it was considering implementing." *WildWest Inst. v. Bull*, 547 F.3d 1162, 1169 (9th Cir. 2008).

The bar for winning a predetermination claim is "high." *Los Angeles*, 63 F.4th at 848. Agencies could not carry out their duties without taking steps toward executing major programs before completing NEPA review. S*ee, e.g.*, *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 205 (4th Cir. 2005). It is thus standard for agencies to enter into agreements that are contingent on independent NEPA review—especially for complex, multiyear projects. *See, e.g.*, *Ctr. for Env't L. & Pol'y v. USBR*, 655 F.3d 1000, 1007 n.3 (9th Cir. 2011); *Forest Guardians v. FWS*, 611 F.3d 692, 718-19 (10th Cir. 2010); *Lee v. U.S. Air Force*, 354 F.3d 1229, 1240 (10th Cir. 2004); *Tenn. Env't Council v. TVA*, 32 F. Supp. 3d 876, 885 (E.D. Tenn. 2014).

The Postal Service had to begin the "multi-year planning and acquisition process of replacing [its] aging fleet" nearly a decade ago. JA950. It reviewed dozens of prototype vehicles, tested prototypes for hundreds of thousands of hours, and evaluated supplier proposals based on cost, vehicle design, and manufacturing capabilities. JA30-31, JA264, JA309-312.[7] Once the Postal Service determined which purpose-built vehicle features best met its operational needs (JA30-31), it requested and evaluated NGDV production proposals. JA31-32. At the end of that thorough, competitive process, the Postal Service entered into a contract with Oshkosh.

The contract was "expressly contingent upon the [Postal Service's] satisfactory completion of the NEPA EIS process." JA866, JA873. A "special provision" on NEPA stated that the Postal Service could not "guaranty either the outcome or duration of the NEPA . . . process," which could "require[]" it to "modify" the contract. JA873. For good measure, the contract also empowered the Postal Service to "order changes," including to the "[s]tatement of work" and the "description of services" Oshkosh would provide (JA898) and to "terminate th[e] contract . . . for its sole

---

[7] Prototyping did not "beg[i]n the Program." Br. 21. The "program" is the action authorized by the Revised ROD to "purchase and deploy[]" 106,480 vehicles. JA930. The Postal Service purchased prototypes through a separate action that plaintiffs do not challenge.

convenience." JA900. The contracts for COTS vehicles contained similar language. *See* JA2175, JA2192-93, JA2195-96, JA2235, JA2252, JA2255-56. Because the contracts reserved to the Postal Service the authority to "alter the plan it was considering implementing," the NEPA process was not predetermined. *WildWest*, 547 F.3d at 1169.

Entering into NEPA-contingent supplier contracts was also "prudent planning." JA12. By executing the NGDV contract, the Postal Service could allocate funds for Oshkosh to undertake assembly-line modifications needed to manufacture both gas and electric vehicles. *See* JA11-12. Advanced planning also provided manufacturers lead time to secure components that require "significant production planning to obtain, such as battery cells and [electric] drivetrain components." California Dkt. 110-1 ¶ 5. The Postal Service's planning complied with NEPA, which allows agencies to take "action in furtherance of [a] proposal while the EIS is being prepared" (*Monsanto*, 561 U.S. at 145) if the action does not have "adverse environmental impact[s]" or "[l]imit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a) (2023). The pre-production preparatory steps that the supplier contracts enabled did not have adverse impacts or limit alternatives. The contracts were contingent on NEPA review by the Postal Service, which retained complete authority to make any changes regarding the vehicles it ultimately chose to "purchase and deploy[]." JA930.

### ii.    Plaintiffs' predetermination arguments lack merit

Plaintiffs are incorrect (Br. 21-26) that the supplier contracts predetermined the outcome of the Postal Service's NEPA review. Plaintiffs argue that the supplier contracts "foreclose[d] certain options from consideration" and that the Postal Service's NEPA analysis "need[ed] to align with the contract[s]." Br. 22-24. But that is belied by the express language of the contracts, which were "contingent on the Postal Service's satisfactory completion of the NEPA EIS process" and authorized the Postal Service to "modify the quantity [or] type" of vehicles "purchased from any supplier" as "a result of the NEPA EIS process." JA873; *see* JA866, JA2175, JA2180. Plaintiffs characterize the contract terms as a "mere formality" (Br. 23), but far from it, the terms were specially negotiated to provide the Postal Service with flexibility for NEPA review. JA12, JA964. Further, agency decisions are entitled to a "presumption of regularity" and plaintiffs do not argue—much less make the required "strong showing"—that the Postal Service acted in "bad faith" or exhibited "improper

behavior," as is necessary to overcome that presumption. *Texas*, 597 U.S. at 811.[8]

The EIS and SEIS flatly contradict plaintiffs' argument that the supplier contracts precluded the Postal Service from analyzing alternatives with a higher percentage of electric vehicles. Br. 25. Two alternatives contemplated purchasing 100% electric vehicles. JA41, JA43-44. In addition, five alternatives contemplated purchasing either no NGDVs or no COTS vehicles. JA38-45, JA956. Moreover, plaintiffs cite no evidence to support their theory that the Postal Service had "already . . . made" the decision to purchase from Oshkosh. Br. 25. Indeed, three alternatives involved no pur-chases from Oshkosh at all. JA43-44. So the supplier contracts clearly did not "limit[]" the Postal Service's NEPA review. Br. 25. To be sure, the Postal Service voiced its preference for alternatives that included NGDVs, which have "enhanced safety and customized operational features" that are "optimal" for mail delivery. JA42. And as plaintiffs note (Br. 24), given the urgent need to replace old vehicles, the Postal Service favored procuring some gas and electric COTS vehicles, which "can be obtained at a faster pace." JA956-57. But NEPA does not require agencies to be "subjec-tively impartial." *Los Angeles*, 63 F.4th at 848. It requires agencies to evaluate the potential envi-ronmental effects of their actions, which the Postal Service did here.

The Ninth Circuit decisions plaintiffs cite where agencies committed to actions they could not alter (Br. 21-26) are inapt. The agencies in those cases made "promise[s]" where changing course would have put them in "breach of contract" (*Metcalf v. Daley*, 214 F.3d 1135, 1144 (9th Cir. 2000)) or took actions that would have been "too late to adjust" after NEPA review. *Latham v. Volpe*, 455 F.2d 1111, 1121 (9th Cir. 1971); *see Conner v. Burford*, 848 F.2d 1441, 1149 (9th Cir. 1988) (action did not "reserve to the government the absolute right to" make changes); *Save the*

---

[8] Plaintiffs misread (Br. 22, 24) two terms that did not limit the Postal Service's authority to make contractual changes based on its NEPA review. *First*, under a 2020 ███████ agreement, Oshkosh Corporation promised to ████████████████████████ ██████████████████████████████████████████ Nothing in that agreement required the Postal Service to order certain vehicles and the later NGDV contract was expressly "contingent upon the [Postal Service's] satisfactory completion of the NEPA EIS process." JA866. *Second*, a provision in a contract for COTS vehicles stated that the Postal Service would not "make changes . . . that would require any changes to the COTS nature of the vehicles or significant detrimental changes to the delivery schedule." JA2252. That industry-standard provision simply prevented the Postal Service from requiring the supplier to customize vehicles or deliver vehicles on an unreasonable timeline. It did not obligate the Postal Service to purchase certain numbers or types of vehicles, and the contract provided that the "obligation to order vehicles . . . [was] expressly contingent upon the satisfactory completion of the NEPA SEIS process." JA2235.

*Yaak Comm. v. Block*, 840 F.2d 714, 718 (9th Cir. 1988) (road "construction . . . had already begun" when agency completed NEPA review); *Thomas v. Peterson*, 753 F.2d 754, 760-61 (9th Cir. 1985) (road built before NEPA review). The Ninth Circuit has explained that these cases are inapplicable when an agency makes "no promises" that commit it to a particular action. *Los Angeles*, 63 F.4th at 849; *see Forest Guardians*, 611 F.3d at 718. The supplier contracts made "no promises" that committed the Postal Service to purchase any particular vehicles. *See* pp. 23-25, *supra*. Charting a different course thus would not have been "too late" or a "breach of contract."

The Postal Service's post-contract actions also do not support plaintiffs' predetermination argument. Plaintiffs primarily argue that the allocation of up to $482 million for Oshkosh to begin production tooling and other assembly-line preparation is evidence of predetermination because the NGDV contract obligated the Postal Service to "pay . . . for any work performed." Br. 23-24; *see* JA900. But establishing predetermination generally requires a claimant to demonstrate that the agency "commit[ted] . . . *natural resources*, not . . . financial resources." *WildWest*, 547 F.3d at 1168; *see Beverly Hills Unified Sch. Dist. v. FTA*, 2016 WL 4650428, at *88 (C.D. Cal. Feb. 1, 2016). A "financial commitment" is evidence of predetermination only where it limits the "choice of reasonable alternatives," such as when an agency spends "most or all of its limited budget on preparations useful for only one alternative." *WildWest*, 547 F.3d at 1169. Here, the Postal Service paid Oshkosh "only a small fraction" of the allocation to complete assembly-line modifications, which were needed "to manufacture *both* [*gas*] *and* [*electric*] NGDV[s]." JA11-12 (emphasis added). The allocation made no "commitment of *natural resources*" and the Postal Service "re-tain[ed] absolute authority to decide" the electric-gas and NGDV-COTS mixes of vehicles. *WildWest*, 547 F.3d at 1168. Indeed, the allocation was not for "the purchase of any vehicles" (JA12) and the EIS analyzed three alternatives that contemplated purchasing no NGDVs at all. JA41-44. The allocation thus did not predetermine the NEPA process.

The remaining actions that plaintiffs cite (Br. 23-25) do not establish predetermination. First, plaintiffs discuss (Br. 23-24) the Postal Service's March 2022 order for 50,000 NGDVs (JA2966-68), 20% of which were originally slated to be electric. JA3046-48. ███████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████ The order cannot establish predetermination because the Postal Service placed it *after* completing the NEPA process. Regardless, the order did not circumscribe the Postal Service's ability under the contract to "modify the quantity [or] type" of "NGDVs purchased" as "a result of the NEPA EIS process." JA873. ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████ It did not limit the Postal Service's authority under the contract to decide which vehicles it would purchase and deploy. Indeed, the Postal Service later "changed" the order's "model mix" to 70% electric vehicles (JA2161-65), ██████████████████████████████ Accordingly, when considering this same issue, Judge Donato concluded that there was "no evidence" that the NGDV contract "locked" the Postal Service "into an arrangement it can't get out of." California Dkt. 121 at 2.

Plaintiffs also quote (Br. 25, 30) a comment by a Postal Service analyst buried in a lengthy spreadsheet evaluating potential alternatives for the SEIS. The analyst stated that a 90%-electric alternative would be "[c]ontractually . . . prob[le]matic" because the Postal Service had ordered 14,500 gas COTS vehicles. JA3418. That lone "individual[] comment[]" from an analyst lacking decision-making authority is "immaterial to the predetermination analysis" because it is not "fairly . . . attributed to the agency" and does not "reflect the agency's irreversible and irretrievable commitment to a course of action." *Forest Guardians*, 611 F.3d at 718 n.20; *see Blue Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438, 447 (9th Cir. 2024) (NEPA claims are not resolved by "selective[ly] quot[ing]" "agency personnel"). The comment does not change the fact that the supplier contracts were expressly contingent on later NEPA review. Plaintiffs' administrative-record "flyspeck[ing]" (*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988)) does not clear the "high" bar for establishing predetermination. *Los Angeles*, 63 F.4th at 848; *see Nevada v. DOE*, 457 F.3d 78, 93 (D.C. Cir. 2006) (collecting cases).

### iii.    Any error was harmless

Even if plaintiffs had established predetermination, any NEPA error would be harmless. Courts must take "due account . . . of the rule of prejudicial error" (5 U.S.C. § 706), the

- 28 -

"administrative law . . . harmless error rule." *Shinseki v. Sanders*, 556 U.S. 396, 406 (2009). An error is harmless if it "had no bearing on the procedure used or the substance of [the] decision reached." *Lotus Vaping Techs., LLC v. FDA*, 73 F.4th 657, 673 (9th Cir. 2023). And a NEPA procedural error is "harmless" if it has "no effect on agency decision making." 40 C.F.R. § 1500.3(d) (2023). The burden of showing prejudice "rests with the [plaintiff]." *Lotus Vaping*, 73 F.4th at 674.

Plaintiffs do not carry that burden. Even if the decision here were predetermined, any such error was harmless because it had no bearing on the NEPA procedures followed or underlying review. The Postal Service analyzed in detail a reasonable range of seven alternatives. *See* pp. 29-32, *infra*. Indeed, EPA's final comments took no issue with that analysis. JA931; *see* JA1789-96. Nor would predetermination have had any bearing on the decision reached. The SEIS explained that different alternatives "would not better satisfy" the program's purpose to urgently modernize its fleet. JA1339; *see* JA265, JA1353, JA1638. Accordingly, entering into contracts that the Postal Service was free to modify based on its NEPA review did not "materially affect[] the substance of" its decision. *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016).

### 2.    The Postal Service Considered A Reasonable Range Of Alternatives

### i.    The Postal Service analyzed seven alternatives in detail

An EIS must describe a "reasonable range of alternatives that are technically and economically feasible, and meet the purpose and need for the proposed action." 40 C.F.R. § 1508.1(z) (2023); *see* 42 U.S.C. § 4332(2)(C)(iii). But an EIS is not supposed to be "encyclopedic." 40 C.F.R. § 1502.2(a) (2023); *cf. id.* § 1502.7 (capping EIS length). "Time and resources are simply too limited . . . to ferret out every possible alternative" (*Vt. Yankee*, 435 U.S. at 551) and "NEPA does not require" agencies to do so. 85 Fed. Reg. 43304, 43330 (July 16, 2020). Rather, agencies must "set forth only those alternatives necessary to permit a reasoned choice." *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 982 (9th Cir. 2022).[9] Agencies do not need to analyze alternatives that are

---

[9] Plaintiffs misstate the law in arguing that an "EIS [is] inadequate" if there are "reasonable but unexamined alternatives." Br. 27 (quoting *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998)). When the cited case was decided, the CEQ regulations stated that an EIS had to "evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a) (1998). CEQ later removed the word "all" to "clari[fy]" that "NEPA does not require consideration of all alternatives." 85 Fed. Reg. at 43330; *see* 40 C.F.R. § 1502.14(a) (2023). CEQ's most recent regulatory revision "reinforce[d]" the point that an agency "need not consider every conceivable alternative." 40 C.F.R.

- 29 -

"infeasible, ineffective, or inconsistent with [its] basic policy objectives." *Japanese Vill., LLC v. FTA*, 843 F.3d 445, 463 (9th Cir. 2016).

The Postal Service considered a reasonable range of alternatives. The Postal Service evaluated seven alternatives: (1) a no-action alternative to continue using old gas vehicles; (2) purchasing 165,000 electric NGDVs; (3) purchasing 165,000 electric COTS vehicles; (4) purchasing 165,000 gas COTS vehicles; (5) purchasing 165,000 NGDVs, at least 10% of which would be electric; (6) purchasing a mix of 106,480 NGDVs and COTS vehicles, 62% of which would be electric; and (7) purchasing 106,480 NGDVs 62% of which would be electric. JA38-45, JA319-51, JA986-95, JA1697-718. Five of these alternatives—not "only two," Br. 28—included electric vehicles. The Postal Service evaluated options with "material differences" in fleet mix and deployment schedules (*Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1101 (9th Cir. 2012)), including "middle ground alternative[s]" between the no-action alternative and a 100%-electric alternative. *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006).

That analysis fulfilled the purpose of the alternatives requirement to "foster[] informed decision-making and informed public participation." *Westlands Water Dist. v. DOT*, 376 F.3d 853, 868 (9th Cir. 2004). The Postal Service was not obligated to analyze "additional mid-range alternative[s]." *Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 1005 (9th Cir. 2013); *see Westlands Water*, 376 F.3d at 871. Indeed, courts routinely uphold NEPA documents that analyze fewer alternatives. *E.g.*, *Earth Island Inst. v. USFS*, 87 F.4th 1054, 1065 (9th Cir. 2023) (two alternatives); *Blank*, 693 F.3d at 1100 (six alternatives); *Protect Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1036 (9th Cir. 2019) (five alternatives); *Kempthorne*, 457 F.3d at 978 (same); *see also Friends of Animals v. Romero*, 948 F.3d 579, 590 (2d Cir. 2020) (four alternatives); *Wyoming v. USDA*, 661 F.3d 1209, 1246 (10th Cir. 2011) (four alternatives).

Plaintiffs' argument that the Postal Service should not get credit for the alternatives it analyzed (Br. 28-31) is meritless. As discussed, the alternatives analysis was not limited by "pre-existing contractual commitments." Br. 28. Indeed, most of the alternatives involved vehicle-

---

§ 1502.14(a) (2024); 89 Fed. Reg. at 35503. Plaintiffs thus also misconstrue (Br. 27) a Postal Service NEPA regulation that copied the language from the old CEQ regulation. *See* 39 C.F.R. § 775.11(c)(5). The purpose of the Postal Service NEPA regulations is simply to "implement the [NEPA] regulations . . . issued by [CEQ]." 39 C.F.R. § 775.1.

purchasing scenarios different than those in the NEPA-contingent supplier contracts. *See* p. 26, *supra*. Plaintiffs are also incorrect that the Postal Service "refused to consider alternatives . . . with more than 62% electric vehicles." Br. 29. The EIS analyzed alternatives to purchase 165,000 electric NGDVs and 165,000 electric COTS vehicles. JA41-44. Plaintiffs' conjecture that the Postal Service did not "truly consider[]" those alternatives (Br. 30-31) finds no support in the record. The Postal Service thoroughly analyzed the potential impacts of procuring and deploying all-electric NGDVs and COTS vehicles. JA69-71, JA74-76, JA324, JA326, JA330-35. It considered greenhouse gas emissions and other pollutants based on EPA-endorsed models (JA69-71, JA74-76) as well as, for example, impacts on utilities and infrastructure (JA79-80), energy and fuel requirements (JA81-82), and waste management (JA85). Plaintiffs thus are incorrect that the Postal Service "ignored reasonable alternatives that would be economically feasible." Br. 29 (discussing *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 576 (D.C. Cir. 2016)).

Plaintiffs selectively quote an EIS comment response explaining that the Postal Service analyzed the "hypothetical maximum[]" percentages of both electric and gas NGDVs under the minimum-10%-electric alternative so that "the public would understand the full potential environmental impacts." JA265 (cited at Br. 30). Nothing in that response indicates that the Postal Service did not seriously evaluate the all-electric alternatives. Plaintiffs home in on the word "hypothetical" (Br. 30-31) but all NEPA alternatives are hypothetical until a final agency decision; the EIS described even the preferred alternative as "hypothetical." JA19, JA41. The cited response was simply explaining that the minimum-10%-electric alternative had two "hypothetical" poles that the Postal Service analyzed: 10% electric NGDVs and 90% electric NGDVs. JA266. The Postal Service elsewhere squarely rejected the suggestion that alternatives with greater than 62% electric vehicles were "not feasible." JA1652. Plaintiffs' fixation on the word "hypothetical" does not overcome the "presumption of regularity" afforded NEPA analysis. *Texas*, 597 U.S. at 811.

Plaintiffs are also incorrect (Br. 30-32) that the decision not to evaluate all-electric alternatives in the SEIS retroactively undermined the earlier consideration of two such alternatives in the EIS. As discussed, the purpose of the SEIS was not to analyze a completely new range of alternatives but rather to "supplement" the EIS by evaluating the environmental impacts of "substantial

changes" to the program. 40 C.F.R. § 1502.9(d)(1)(i) (2023); *see Marsh*, 490 U.S. at 371 n.14. Those changes were partially based on the increasingly urgent need to replace old postal vehicles. *See* JA956-57, JA932, JA1630-31, JA1637. The alternatives in the SEIS reasonably reflected the fact that cost and operational limitations of currently available electric vehicles, and the lengthy process to install charging stations, mean that alternatives with some gas vehicles better address that urgent need. *Id.*; *see* JA958, JA1625-26, JA1633-34 (discussing limitations of electric vehicles), JA1649 (discussing other budgeting needs). Thus, as the Postal Service explained, it "already considered" "high [electric] percentage[]" alternatives in the EIS and focused the SEIS on additional alternatives that took into account changed circumstances. JA1638. Plaintiffs cite no decision supporting their view that focusing an SEIS on a narrow set of alternatives that reflect "significant new circumstances" and "substantial changes to the . . . action" (40 C.F.R. § 1502.9(d)(1) (2023)) somehow undermines previous alternatives analysis in an EIS.

Similarly, the fact that the SEIS discussed several "consideration factors" that guided the Postal Service's selection of *additional* alternatives for review (JA956-58 (discussed at Br. 30-32)) does not undermine the EIS's earlier alternatives analysis. Plaintiffs argue that analysis of two all-electric alternatives in the EIS could not have been "meaningful[]"because the SEIS analyzed "only Alternatives that included . . . some [gas] vehicles." Br. 30. But as discussed, the SEIS's more narrow focus on alternatives that better met the increasingly urgent need to replace vehicles does not undermine the earlier EIS analysis. Plaintiffs also note (Br. 30) that one consideration factor was electric vehicles' unsuitability for some rural postal routes. JA957-58. Yet the ROD explained that this fact "did not" render "either of the [all-electric alternatives] infeasible." JA6. Because the ROD authorized replacing only part of the postal fleet (JA35, JA38), the Postal Service could have selected an all-electric option and "prioritize[d]" placing those vehicles on suitable routes. JA40. Changed circumstances led the Postal Service to focus the SEIS on alternatives that included gas vehicles. Because alternatives with some gas vehicles best met the urgent need to replace old vehicles, the SEIS reasonably considered route suitability as an additional—but not determinative—factor when selecting additional alternatives. *See* JA935.

ii.    **NEPA does not require agencies to analyze commenters' pre-ferred alternatives**

Plaintiffs are also incorrect (Br. 26-29) that the Postal Service needed to analyze theirs and other commenters' preferred alternatives. The range of alternatives considered "is a determination for the agency to make." *Latin Americans for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 756 F.3d 447, 472 (6th Cir. 2014); *see* 89 Fed. Reg. at 35504 (discussing agency "discretion to identify th[e] range" of alternatives). The CEQ regulations provide that an agency "may respond" to comments by "[d]eveloping . . . alternatives not previously . . . consider[ed]," but they do not require agencies to do so. 40 C.F.R. § 1503.4(a)(1) (2023). In fact, the regulations state that "agencies are *not* required to respond to each comment" and that a response may simply "[e]xplain[] why the comments do not warrant further" consideration. *Id.* (emphasis added).

Courts thus have rejected claims that NEPA "require[s]" agencies to evaluate alternatives suggested in "a public comment." *Env't Prot. Info. Ctr. v. Blackwell*, 389 F. Supp. 2d 1174, 1201 (N.D. Cal. 2004); *see, e.g.*, *Earth Island*, 87 F.4th at 1065. To require the Postal Service to analyze all commenters' alternatives would contravene NEPA's "rule of reason" (*City of Carmel-By-The-Sea v. DOT*, 123 F.3d 1142, 1150 (9th Cir. 1997)) and ignore the Supreme Court's instruction that an agency need not use its limited resources to "include every alternative . . . thought conceivable by the mind of man." *Vt. Yankee*, 435 U.S. at 551.

The Postal Service complied with NEPA by including in the EIS and SEIS extensive responses to comments. JA263-304, JA1336-61, JA1625-58. Many of those responses explained why the Postal Service declined to analyze commenters' preferred alternatives. *E.g.*, JA265, JA301, JA1336-37, JA1339, JA1627-28, JA1635-39. For example, EPA suggested that the Postal Service "should purchase 90 percent" electric vehicles based on a total-cost-of-ownership analysis. JA1627. The Postal Service explained that the urgent need to replace vehicles "immediately," and competing budgeting "priorities" to "remedy years of deferred maintenance and to modernize . . . infrastructure," militated against prioritizing total cost of ownership to increase the percentage of electric vehicles. JA1628.

Further, agencies are not required to analyze alternatives that are not "technically and economically feasible" or that do not "meet the purpose and need" of the action. 40 C.F.R. § 1508.1(z)

(2023). The Postal Service explained in response to comments why a number of plaintiffs' suggestions (Br. 13, 27-28, 32) were not feasible. For example, plaintiffs suggest incorporating into the postal fleet "hybrid vehicles, cargo bikes, small battery electric vehicles, or low-speed options" (Br. 13) but potential suppliers did not include hybrid vehicles in their bids (JA293) and the Postal Service is still "testing and evaluating electronic bike" and other delivery options for "future procurements." JA1349; *see* JA1642. And as discussed (pp. 21-22, *supra*), the Postal Service reasonably responded to commenters' suggestions about alternative battery and charging options and competitors' electric vehicles. *See* Br. 27, 32.

### iii.    Any error was harmless

Any conceivable error regarding the range of alternatives considered would be harmless. The Postal Service analyzed seven alternatives ranging from 0% to 100% electric vehicles. JA38-45, JA319-51, JA986-95, JA1697-718. By analyzing those alternatives, the Postal Service was "fully aware of the environmental consequences of the proposed action" (*Idaho Wool*, 816 F.3d at 1104) and provided sufficient information to foster "informed decision-making and informed public participation." *Westlands Water*, 376 F.3d at 868. Plaintiffs do not explain how "additional mid-range alternative[s]" (*Mont. Wilderness*, 725 F.3d at 1005) would have helped the Postal Service or the public better understand the program's environmental impacts. And as discussed, the Postal Service explained that analyzing additional middle-ground alternatives would not have impacted its decision-making. *See* JA1339, JA1638, JA265. Plaintiffs thus have not carried their burden of showing harm from the alleged alternatives error.

### 3.    The Emissions Modeling Was Reasonable

Plaintiffs devote only two paragraphs to arguments about the Postal Service's actual environmental analysis. They contend (Br. 35-36) that the Postal Service underestimated emissions by misclassifying two of the new vehicles. That is incorrect.

To estimate direct emissions of greenhouse gases and other pollutants, the Postal Service used the then-current version of EPA's MOVES model. JA981. Under that model, emissions are estimated based on several factors, including pollutant "source type." U.S. Env't Protection Agency, *Population and Activity of Onroad Vehicles in MOVES3* 19 (Apr. 2021),

- 34 -

https://perma.cc/LRZ4-JF5Y. Source type is the model's "primary vehicle classification" and comprises "groups of vehicles with similar activity and usage patterns." *Id.* at 11. Each source type is made up of "regulatory classes" of vehicles "subject to similar emission[s] standards." *Id.* at 12. The "light commercial truck" source type includes two regulatory classes of vehicles "primarily [for] non-personal use"—"light-duty trucks" that weigh 6,001-8,500 pounds and "light-heavy duty" trucks that weigh 8,501-14,000 pounds. *Id.* at 12-13, 17-18. The light-heavy duty regulatory class is also a part of other source types, all of which range up to 33,000 pounds, including "school buses," "refuse trucks," and "short-haul single unit trucks." *Id.* at 12-13, 18.

Here, the Postal Service reasonably estimated emissions by assigning the three gas COTS vehicles and NGDVs to the light-commercial-truck source type, which encompasses vehicles from 6,001-14,000 pounds. JA982, JA1651, JA1699, JA324. The COTS vehicles and NGDVs weigh 6,834 pounds, 8,700 pounds, and 8,900 pounds (JA1720), well within the light-commercial-truck source type range. The Postal Service explained that plaintiffs' preferred approach—analyzing the 8,700-pound and 8,900-pound vehicles based on their light-heavy-duty regulatory class—would be less "accurate" because that class "largely encompass[es] vehicles with much larger engines that use more fuel" and have "a higher weight distribution [of] 8,500 to 14,000 pounds." JA1651. By contrast, the light-commercial-truck source type "sufficiently covers" those vehicles because it "encompasses vehicles" that have "various engine sizes" with a "weight range between 6,000 and 14,000 pounds." *Id.* The Postal Service thus provided a rational explanation regarding its application of EPA's emissions model.

### 4. The Analysis Of Environmental-Justice Impacts Was Reasonable

Plaintiffs' argument about the environmental-justice analysis (Br. 36-37) is erroneous. To begin with, the Court should not consider plaintiffs' claim. Neither NEPA nor the applicable CEQ regulations mandates environmental-justice analysis. Several executive orders require certain agencies to analyze such impacts. *See* 88 Fed. Reg. 25251, 25253 (Apr. 21, 2023); 59 Fed. Reg. 7629, 7630-31 (Feb. 16, 1994). But those orders do not place requirements on independent agencies like the Postal Service. Rather, they "encourage[]" and "request[]" independent agencies to consider environmental justice. 88 Fed. Reg. at 25256; 59 Fed. Reg. at 7632. Even if the orders were binding,

- 35 -

DEFENDANTS' FINAL OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT, Case Nos. 3:22-cv-2576; 3:22-cv-2583

the Ninth Circuit has held that they create no "right to judicial review for alleged noncompliance." *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 575 (9th Cir. 1998); *see* 88 Fed. Reg. at 25261 (The order "does not . . . create any right . . . enforceable at law."); 59 Fed. Reg. at 7632-33 (similar). As plaintiffs note (Br. 36), several other courts have endorsed APA arbitrary-and-capricious review of environmental-justice analysis where agencies "exercised . . . discretion to include [such] analysis in [their] NEPA evaluation[s]." *Trenton Threatened Skies, Inc v. FAA*, 90 F.4th 122, 138 (3d Cir. 2024) (citing decisions). But the PRA prohibits APA challenges to Postal Service discretionary decisions, including its decision here to analyze environmental-justice impacts apart from any NEPA obligations. Plaintiffs' claim thus is triply nonreviewable.

Regardless, the Postal Service "fulfill[ed] the[] spirit" of the executive orders by considering the program's environmental-justice effects. JA1002. Using tools developed by EPA, CEQ, and other federal agencies, the Postal Service conducted a comprehensive analysis of environmental burdens affecting disadvantaged populations. JA1672-92. That analysis determined that 84% of the sites where the Postal Service intends to prioritize vehicle deployments are in communities that environmental burdens particularly affect. JA1005, JA1672-74. The SEIS analyzed the environmental impacts of both "[e]xisting [c]onditions" and deploying new, cleaner vehicles on nearby communities—including environmental-justice communities. JA1005-06, JA1008. Plaintiffs thus are incorrect that the Postal Service assumed that the program would have "equal impact on communities regardless of income and geography" and did not "examine impacts from the continued operation" of old vehicles. Br. 36-37. The SEIS reasonably focused the environmental-justice review on communities in the vicinity of the agency action. *See*, *e.g.*, *Trenton Threatened Skies*, 90 F.4th at 138-39; *Sierra Club v. FERC*, 867 F.3d 1357, 1368-70 (D.C. Cir. 2017).

The EIS and SEIS also more broadly analyzed potential air-quality impacts on a "nationwide level." JA981; *see* JA958-64, JA966-1011, JA46-48, JA314-55. The Postal Service concluded that the national air-quality benefits of replacing 32-year-old vehicles with mostly electric vehicles and some less-polluting gas vehicles "would occur regardless of race or socioeconomic status." JA53. Accordingly, the premise of plaintiffs' argument that the Postal Service should have evaluated the program's "negative emissions impacts . . . on environmental-justice communities" (Br.

37) is incorrect; the program will indisputably improve air quality and plaintiffs do not explain why certain communities would experience those benefits differently. Likewise, there is no support for plaintiffs' argument that the Postal Service did not "address . . . comments" on environmental justice. Br. 36. The EIS, SEIS, and drafts of those documents contain extensive responses to four rounds of comments, including on environmental justice. JA289-90, JA302, JA1338-39, JA1346-47, JA1361, JA1636-37, JA1640, JA1645, JA1648, JA1796. In fact, EPA noted its "appreciat[ion]" for the Postal Service's focus on environmental justice. JA1796.

### 5.    The Program Is Consistent With The Government Plaintiffs' Laws

The CEQ regulations require an EIS to "discuss any inconsistency of a proposed action with any approved State . . . or local plan or law." 40 C.F.R. § 1506.2(d) (2023). That is not an onerous obligation. *See Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 877 (9th Cir. 2017). The Postal Service complied with that obligation here by explaining that the program had no "legal inconsistencies" with state or local plans or laws. JA1359; *see* JA285, JA1336, JA1640-41.

The program is not "inconsisten[t]" with the laws plaintiffs cite. Br. 6-7, 38-39. For example, a California law requires regulators to adopt rules that "ensure that statewide greenhouse gas emissions are reduced to at least 40 percent" of 1990 levels by 2030. Cal. Health & Safety Code § 38566 (discussed at Br. 38); *see id.* §§ 38550-51. Other States also have "policies and plans" that require greenhouse gas emission reductions and promote electric vehicle development through sales and registration targets. Br. 38-39. But those long-term targets do not mandate the purchase or use of specific vehicles or otherwise establish requirements that apply to the Postal Service. Regardless, the SEIS explained that the program will result in "significant greenhouse gas emission reductions . . . in accordance with those goals and ambitions." JA1641. And the Postal Service is continuing to assess the possibility of "achieving 100% electrification for the overall" delivery fleet, which would further advance those goals. *EV Press Release*; *see* JA932, JA1783, JA1639.[10]

---

[10] Plaintiffs misread an internal briefing in arguing that vehicle "deployment plans" should have considered state emissions goals. Br. 38. The Revised ROD did not select vehicle deployment locations. The Postal Service will make those case-by-case decisions based on "delivery route characteristics" and other operational factors (JA960) and the ability to "leverage[]" "existing power

- 37 -

1    **III.    VACATUR AND AN INJUNCTION ARE UNWARRANTED**

2        Plaintiffs lack standing and the Revised ROD complied with NEPA so no remedy is war-

3    ranted. But should the Court grant summary judgment to plaintiffs, the Postal Service agrees that

4    the Court should order remedy briefing before considering plaintiffs' request to vacate the Revised

5    ROD and enjoin the program nationwide. *See* Br. 40 n.13. Whether to enjoin or vacate a major

6    agency action is a fact-dependent inquiry that the Court should resolve with the benefit of full

7    briefing. In any event, the facts do not support either remedy.

8        As an initial matter, although plaintiffs contend that they do not seek to "remov[e] . . . ve-

9    hicles that have already been delivered and/or deployed," that is what would happen if the Court

10   were to grant their request to "vacate the . . . revised ROD." Br. 40. The Revised ROD is what

11   authorizes the Postal Service to "implement [its] Preferred Alternative" to "purchase and deploy[]"

12   new vehicles. JA930. Vacating that action thus would prevent the Postal Service from "deploying"

13   new gas and electric vehicles nationwide. Plaintiffs should clarify whether they are, in fact, seeking

14   vacatur or instead are pursuing only narrower injunctive relief to prevent the Postal Service from

15   "acqui[ring] [additional] gas-powered vehicles." Br. 39.

16       If plaintiffs are seeking vacatur, the Court should not grant that relief. When "equity de-

17   mands," courts remand without vacatur for agencies to fix NEPA errors. *Ctr. for Food Safety v.*

18   *Regan*, 56 F.4th 648, 663 (9th Cir. 2022). Courts must "weigh the seriousness of the agency's errors

19   against 'the disruptive consequences of an interim change that may itself be changed.'" *Id.* Here,

20   the EIS and SEIS contained detailed analysis of potential impacts. The alleged NEPA violations

21   are relatively minor process errors that the Postal Service could easily "cure . . . on remand." *Solar*

22   *Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 997 (9th Cir. 2023). For example, plaintiffs argue that

23   the Postal Service should have considered additional middle-ground alternatives. The Postal Ser-

24   vice could fix that alleged error on remand by analyzing additional alternatives. That is not the type

25   of "serious omission" that supports vacatur. *Id.* at 997. The Court must weigh the alleged (fixable)

26   NEPA errors against the disruptive consequences of vacatur, which, as discussed below, would be

27   enormous. Further, vacatur would prolong plaintiffs' and their members' exposure to heightened

28   infrastructure" for charging stations. JA997; *see* JA1358. The briefing "model[ed]" potential de-
     ployment scenarios (JA3129-207); it did not make any final "deployment plans."

emissions from old vehicles. Courts have denied vacatur in similar circumstances where such relief would contribute to the "very danger" plaintiffs sought to prevent. *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012).

An injunction is also unwarranted. Injunctions are "drastic and extraordinary" and "should not be granted as a matter of course." *Monsanto*, 561 U.S. at 165. Rather, a plaintiff must demonstrate that (1) "it has suffered an irreparable injury"; (2) "remedies available at law . . . are inadequate to compensate for that injury"; (3) "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted"; and (4) "the public interest would not be disserved by a permanent injunction." *Id.* at 156-57. Here, the public-interest element "merge[s]" with the Postal Service's interest. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

In the NEPA context, the Supreme Court has urged courts to consider less drastic remedies, "including declaratory relief or an injunction tailored to the preparation of an EIS." *Winter v. NRDC*, 555 U.S. 7, 33 (2008). Indeed, *Winter* warned that a NEPA violation typically does not warrant an injunction because the "ultimate legal claim" is that the agency should conduct further environmental review, not that it must "cease" the underlying action. *Id.* at 32; *see Monsanto*, 561 U.S. at 157 (rejecting a "thumb on the scales" favoring injunctions in NEPA cases); *Forelaws on Bd. v. Johnson*, 743 F.2d 677, 686 (9th Cir. 1984) (noting NEPA's "flexibility in remedy").

The NEPA errors that plaintiffs allege, even if accurate, would not justify a nationwide injunction of a major program to modernize the national postal fleet. Plaintiffs will suffer no irreparable injury from the program; indeed, they will benefit from reduced air pollution. *See* pp. 12-14, *supra*. But even if emissions from deploying less-polluting gas vehicles injured plaintiffs in specific locations, that would not justify an injunction prohibiting the Postal Service from "acqui[ring]" such vehicles. Br. 19. Simply acquiring gas postal vehicles does not harm plaintiffs.

On the other side of the ledger, a nationwide injunction would force the Postal Service to continue using decades-old gas vehicles, exacerbating plaintiffs' and their members' exposure to heightened emissions, and exposing mail carriers, other drivers, and pedestrians to unnecessary safety risks and exhaust. *See* JA941, JA967. An injunction also would significantly hamper the Postal Service's ability to efficiently and reliably deliver the mail. It would force the Postal Service

to stop replacing unreliable, 32-year-old vehicles that are expensive to maintain (JA968), jeopardizing its ability to fulfill its obligation to promptly, efficiently, and reliably deliver the mail. *See* 39 U.S.C. § 101(a)-(b), (f). The resulting mail slowdown would have predictably disastrous consequences for the economy and public health and could impact upcoming elections.

For these reasons, the Court should not enjoin gas vehicle acquisitions. But if the Court is otherwise inclined, it should narrowly tailor an injunction to prevent only the acquisition of gas vehicles *for deployment in specific locations* where plaintiffs establish imminent harms. Injunctions generally "operate with respect to specific parties" (*California v. Texas*, 593 U.S. 659, 672 (2021)) and "must be 'narrowly tailored to remedy the specific harm shown.'" *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019). The Ninth Circuit has upheld nationwide injunctions only in "exceptional cases" (*City and Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018)) where "such breadth was necessary to remedy" a plaintiff's "particular harm." *E. Bay Sanctuary*, 934 F.3d at 1029. In NEPA cases, courts have no trouble issuing narrow injunctions. *E.g.*, *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 844 (9th Cir. 2007).

Plaintiffs identified several neighborhoods where organization members will allegedly suffer harm from gas vehicle use. The Court could remedy the members' harms without a nationwide injunction by prohibiting the Postal Service from using new gas vehicles in those specific neighborhoods. The government plaintiffs have not established specific, imminent injuries (*see* pp. 15-16, *supra*), but even if they had, any injunction outside their borders would impair the interests of other States not before the Court. Those States' potential interest in a modernized, less-polluting postal fleet are just as substantial as the government plaintiffs' interests. Even the broadest relief thus should stop at the government plaintiffs' borders.

## CONCLUSION

The Court should deny plaintiffs' motion for summary judgment and grant the Postal Service's motion for summary judgment on all claims.

1    Dated: November 20, 2024                    Respectfully submitted,

2                                                */s/ Timothy S. Bishop*
                                                 Timothy S. Bishop (*pro hac vice*)
3                                                Avi M. Kupfer (*pro hac vice*)
                                                 MAYER BROWN LLP
4                                                71 S. Wacker Drive
                                                 Chicago, IL 60606
5                                                (312) 701-7829
                                                 tbishop@mayerbrown.com
6                                                akupfer@mayerbrown.com
7
                                                 Miriam R. Nemetz (*pro hac vice*)
8                                                MAYER BROWN LLP
                                                 1999 K Street NW
9                                                Washington, DC 20006
                                                 (202) 263-3000
10                                               mnemetz@mayerbrown.com
11
                                                 Christopher Mitchell Hendy (SBN 282036)
12                                               MAYER BROWN LLP
                                                 350 South Grand Avenue
13                                               Los Angeles, CA 90072
                                                 (213) 229-9500
14                                               mhendy@mayerbrown.com
15
                                                 *Attorneys for Defendants United States*
16                                               *Postal Service and Louis DeJoy*
17

18

19

20

21

22

23

24

25

26

27

28